# BOSTON AND MAINE RAILROAD *v.* HOOKER.

ERROR TO THE SUPERIOR COURT OF THE STATE OF MASSACHUSETTS.

No. 121. Argued December 10, 11, 1913.—Decided April 6, 1914.

Congress, by the Hepburn Act and the Carmack amendment in 1906, has regulated the subject of interstate transportation of property by Federal law to the exclusion of the States to control it by their own policy or legislation. *Pennsylvania* v. *Hughes*, 191 U. S. 477, distinguished, having been decided prior to the passage of the Hepburn Act.

Knowledge of the shipper that the rate is based on value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Interstate Commerce Commission, and the effect of so filing the schedules makes the published rates binding upon shipper and carrier alike.

The limitation of liability of carriers for passengers' baggage is covered by the Interstate Commerce Act and the Carmack amendment to the Hepburn Act applies thereto as well as to liability for shipments of freight.

Under § 6 of the Interstate Commerce Act carriers must include in the schedules of rates filed regulations affecting passengers' baggage and the limitations of liability.

A provision in a tariff schedule that the passenger must declare the value of his baggage and pay stated excess charges for excess liability over the stated value to be carried free, is a regulation within the meaning of §§ 6 and 22 of the Interstate Commerce Act and as such is sufficient to give the shipper notice of the limitation.

In construing a statute, the practical interpretation given to it by the administrative body charged with its enforcement is entitled to weight.

The effect of permitting the carrier to file regulations as to passengers' baggage which limit its liability except on payment of specified rates is not to change the common law rule that the carrier is an insurer against its own negligence but simply that the carrier shall obtain commensurate compensation for the responsibility assumed.

Where charges for full liability as specified in the published tariff are unreasonable, they can only be attacked before the Interstate Commerce Commission.

Congress is familar with the customs of travelers including that of checking baggage; and so *held* that a baggage check is sufficient compliance as to passengers' baggage with the provision in the Carmack amendment for issuing a receipt or bill of lading for the shipment.

If the subject needs regulation it is within the power of the Interstate Commerce Commission, under §§ 1 and 15 of the Act of June 18, 1910, to make requirements as to checks or receipts to be given for baggage by common carriers.

209 Massachusetts, 598, reversed.

THE facts, which involve the construction of the Car-

mack Amendment to the Hepburn Act and the right of a common carrier which has filed schedules containing regulations as to passengers' baggage to limit its liability for loss of such baggage caused by its own negligence to the extent and in the manner specified in the schedules, are stated in the opinion.

*Mr. Frederick N. Wier*, with whom *Mr. Edgar J. Rich* was on the brief, for plaintiff in error:

Congress has assumed exclusive jurisdiction of the subject-matter in issue thereby making the determination of the effect and validity of the baggage regulations of the plaintiff in error a Federal question.

Rates, parts of rates, and regulations affecting or determining rates, fares, and charges, or the value of the service rendered, have the force of law and therefore enter into and become a part of all contracts for interstate transportation.

The regulations contained in the schedules of the railroad company providing for carrying 150 pounds of personal baggage not exceeding $100 in value free for each passenger on presentation of a full ticket and specifying rates for excess value, have the force of law.

Such regulations are not void as being contrary to the common law or as against public policy or in violation of any Federal statute.

The reasonableness of the regulations is not in issue.

The regulations do not offend any principle of common law or public policy.

The regulations are not in violation of any Federal statute.

Such regulations are a part of the rates, and are regulations affecting or determining rates, fares, and charges, or the value of the service rendered, and when contained in

the schedules of the plaintiff in error had the force, of law and entered into and became a part of the contract with defendant in error.

The regulations affected and determined rates, fares, and charges.

The regulations affected and determined the value of the service rendered.

Upon the ground of estoppel the limit of liability is $100 and would be even if the regulations of the railroad company were confined to the first paragraph.

In support of these contentions, see *Adams Ex. Co. v. Croninger,* 226 U. S. 491; *Andrews v. Andrews,* 188 U. S. 14; *Alair v. North Pacific R. R.,* 53 Minnesota, 160; *Armour Packing Co. v. United States,* 209 U. S. 56; *Bernard v. Adams Exp. Co.,* 205 Massachusetts, 254; *Blumantle v. Fitchburg R. R.,* 127 Massachusetts, 322; *Chicago & Alton Ry. Co. v. Kirby,* 225 U. S. 155; *Fourth Nat. Bank v. Olney,* 63 Michigan, 58; *Hammond v. Whittredge,* 204 U. S. 538; *Hart v. Penn. R. R. Co.,* 112 U. S. 331; *Hoeger v. Chi., Mil. & St. P. Ry. Co.,* 63 Wisconsin, 100; *Re Released Rates,* 13 I. C. C. 550; *Jordan v. Massachusetts,* 225 U. S. 167; *Kansas City Ry. Co. v. Carl,* 227 U. S. 639; *Louis. & Nash. Ry. v. Motley,* 219 U. S. 467; *Mo., Kan. & Tex. Ry. Co. v. Harriman,* 227 U. S. 657; *N. Y. C. & H. R. R. R. Co. v. Fraloff,* 100 U. S. 531; *N. Y., N. H. & H. R. R. v. Int. Com. Comm.,* 200 U. S. 361; *Polleys v. Black River Imp. Co.,* 113 U. S. 81; *Squire v. N. Y. C. R. R. Co.,* 98 Massachusetts, 239; *Stanley v. Schwalby,* 162 U. S. 255; *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U. S. 426; *Tex. & Pac. Ry. Co. v. Mugg,* 202 U. S. 242; *Wells, Fargo & Co. v. Neiman-Marcus Co.,* 227 U. S. 469; *York Co. v. Central R. R.,* 3 Wall. 107.

*Mr. Samuel Williston* for defendant in error:

The carrier and its agents, having received possession of the goods, were charged with the duty of delivering them

or explaining why that had not been done. *Galveston Ry. Co.* v. *Wallace*, 223 U. S. 481, 492.

There is no question involved of the limits of Federal and state laws.

By the rule of the common law a limitation of liability was invalid unless a special contract was made by which the shipper agreed thereto, or unless the shipper was estopped by misrepresentation. *Brown* v. *Eastern R. R.*, 11 Cush. 97; *Malone* v. *Boston & Worcester R. R.*, 12 Gray, 388; *Graves* v. *Adams Exp. Co.*, 176 Massachusetts, 280; *John Hood Co.* v. *Am. Pneumatic Co.*, 191 Massachusetts, 27; *The Majestic*, 166 U. S. 375; *Henderson* v. *Stevenson*, L. R. 2 H. L. (Sc.) 470, 481.

There can be no limitation of liability without the assent of the shipper. *Cau* v. *Texas & Pacific Ry. Co.*, 194 U. S. 427, 431; *N. J. Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 344.

The law in the absence of special contract fixes the degree of care and diligence due from the railroad company to persons carried on its trains. *York Co.* v. *Central Railroad*, 3 Wall. 107; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Hart* v. *Pennsylvania R. R.*, 112 U. S. 331, 343; *Liverpool Steam Co.* v. *Phœnix Ins. Co.*, 129 U. S. 397, 441, 442; *Saunders* v. *Southern Railway*, 128 Fed. Rep. 15.

Similar decisions have been made in recent years in precisely the same manner as before the passage of the Interstate Commerce Acts. *Williams* v. *Central R. R. Co.*, 183 N. Y. 518; *S. C.*, 93 N. Y. App. Div. 582; *Martin* v. *Central R. R. Co.*, 121 N. Y. App. Div. 552; *Homer* v. *Oregon Short Line*, 128 Pac. Rep. 522; *Black* v. *Atlantic Coast Line*, 82 So. Car. 478; Elliott on Railroads (4th ed.), § 1510; Hutchinson on Carriers (3d ed.), §§ 401, 405; *Pennsylvania R. R.* v. *Hughes*, 191 U. S. 477; *Adams Express Co.* v. *Green*, 112 Virginia, 527.

A few States have upheld to its full extent a contract of valuation or limiting liability, but have also held that

no merely formal assent can be inferred from accepting a bill of lading or a receipt without actual knowledge of its contents, and without the shipper's attention being called by the carrier to the limitation, though an agreement made with full knowledge of the situation would bind the shipper. See Hutchinson, Carriers (3d ed.), § 410; *Plaff* v. *Pacific Exp. Co.*, 251 Illinois, 243; *Hill* v. *Adams Exp. Co.*, 82 N. J. L. 373; *Wichern* v. *U. S. Exp. Co.*, 83 N. J. L. 241.

The ground upon which the validity of a limitation upon a recovery for loss or damage due to negligence depends is that of estoppel. *Wells, Fargo & Co.* v. *Neiman-Marcus Co.*, 227 U. S. 469, 476; *Kansas City So. Ry. Co.* v. *Carl*, 227 U. S. 639, 651. *Adams Express Co.* v. *Croninger,* 226 U. S. 491, distinguished.

While in Massachusetts it has been the law that the acceptance of a document binds one who receives it, though he may not choose to read it, as held in *Grace* v. *Adams*, 100 Massachusetts, 505; *Grinnell* v. *West. Un. Tel. Co.*, 113 Massachusetts, 299; *Hoadley* v. *Nor. Transp. Co.*, 115 Massachusetts, 304; *Clement* v. *West. Un. Tel. Co.*, 137 Massachusetts, 463; *Graves* v. *Adams Exp. Co.*, 176 Massachusetts, 280, and see *Cau* v. *Tex. & Pac. Ry. Co.*, 194 U. S. 427, 431, it has also been the law both of this court and of the Massachusetts court that a public notice of an asserted limitation by the carrier, even though the shipper was aware of it (which was not the fact in the case at bar), does not have the effect of an agreement or representation. Some actual assent is necessary. *N. J. Steam Nav. Co.* v. *Merchants' Bank*, 6 Howard, 344, 382; *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 318, 328; *Judson* v. *West. R. R. Corp.*, 6 Allen, 486, 491; *Buckland* v. *Adams Exp. Co.*, 97 Massachusetts, 124, 131. See also 1 Hutchinson on Carriers, 3d ed., § 406; *Henderson* v. *Stevenson*, L. R. 2 H. L. (Sc.) 470; *Richardson* v. *Rowntree* (1894), A. C. 217; *Parker* v. *Southeastern Ry. Co.*, 2 C. P. D. 416.

A limitation of liability is not a rate. It is a limitation or diminution of the service, agreed to generally in order to secure a lower rate. The carrier's reward ought to be proportionate to the risk. *Kansas City So. Ry. Co. v. Carl*, 227 U. S. 639, 650; *Railroad Co. v. Fraloff*, 100 U. S. 24, 27.

The *Carl Case* is not to be understood as meaning that a limitation of liability or the valuation on which such a limitation is based is literally part of the rate itself. *Adams Express Co. v. Croninger*, 226 U. S. 491, 509; *Bernard v. Adams Exp. Co.*, 205 Massachusetts, 254, 259.

It is a contract as to what the property is in reference to its value. The only ground upon which the limitation can stand is that it was filed as part of the rate. Estoppel can in no way enlarge or diminish or in any way affect a filed rate. *Wells, Fargo & Co. v. Neiman-Marcus Co.*, 227 U. S. 469, 475; *Kansas City So. Ry. Co. v. Carl*, 227 U. S. 639, 651.

The amendments to the Interstate Commerce Act in 1906 did not change the law either as to what a rate is or what the effect is of a rate duly filed. Whatever is now binding as a rate upon a shipper was binding before 1906. *The Majestic*, 166 U. S. 375; *Cau v. Tex. & Pac. Ry. Co.*, 194 U. S. 427, 431; *Saunders v. Southern Ry.*, 128 Fed. Rep. 15; *Chi., Mil. &c. Ry. Co. v. Solan*, 169 U. S. 133; *Pennsylvania R. R. v. Hughes*, 191 U. S. 477.

A limitation of liability in any form except by contract or a representation by the shipper has never been permitted by the law. The attempt to escape from this rule of the common law is as ineffectual as the attempt to escape the statutory liability cast upon an initial carrier by the Carmack Amendment, which was held futile in *Atlantic Coast Line v. Riverside Mills*, 219 U. S. 186; *Galveston &c. Ry. Co. v. Wallace*, 223 U. S. 481; *Norf. & West. Ry. Co. v. Dixie Tobacco Co.*, 228 U. S. 593.

A limitation of liability is not within the meaning of the

words "Rule, Regulation, or Practice." *Curry v. Marvin,* 2 Florida, 411, 415; *In re Leasing of State Lands,* 18 Colorado, 359; *Martin v. Cent. R. R. Co.,* 121 N. Y. App. Div. 552, 553. *Railroad Company v. Fraloff,* 100 U. S. 24, 27, distinguished.

A regulation which needs the assent of the person who is to be regulated as a condition of its efficacy is not properly called a regulation. It is not even an offer, until brought to the knowledge of the person to whom it is addressed.

There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute. *Armour Packing Co. v. United States,* 209 U. S. 56, 81; *Louis. & Nash. Ry. v. Mottley,* 219 U. S. 467, 479.

The fact that a proposed limitation of a carrier's liability must be filed as part of the tariff does not involve the conclusion that all shippers thereupon become bound by the limitation. *Wehmann v. Minneapolis Ry. Co.,* 58 Minnesota, 22, 29; *Mannheim Ins. Co. v. Erie &c. Transp. Co.,* 72 Minnesota, 357.

The passenger was not chargeable with constructive assent to the asserted limitation of liability.

A law or a statute is binding, whether persons subject to the law are aware of it or not. A rate duly filed is unquestionably equally binding; but shippers are not conclusively presumed to know it. *Kansas City So. Ry. Co. v. Carl,* 227 U. S. 639, 652; *Pennsylvania R. R. Co. v. Int. Coal Co.,* 230 U. S. 184, 197; *Potter v. United States,* 155 U. S. 438; *Standard Oil Co. v. United States,* 164 Fed. Rep. 376; *Standard Oil Co. v. United States,* 179 Fed. Rep. 614; *Armour Packing Co. v. United States,* 209 U. S. 56, 85.

There is no estoppel barring defendant in error from showing the value of her baggage. *Kansas City So. Ry. Co. v. Carl,* 227 U. S. 639, 651; *Matter of Released Rates,* 13 I. C. C. 550

Judicial decisions do not support the construction of the statute contended for by the plaintiff in error.

Although a shipper has no redress because a rate is unreasonable, except by the direct proceedings allowed by the act, *Tex. & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Robinson* v. *Balt. & Ohio R. Co.*, 222 U. S. 506; *Pennsylvania R. R. Co.* v. *Int. Coal Co.*, 230 U. S. 184; *Mitchell Coal Co.* v. *Pennsylvania R. R. Co.*, 230 U. S. 247, and the unreasonableness of a rule, regulation, or practice of a carrier must be objected to in the same way, *Balt. & Ohio R. R.* v. *United States*, 215 U. S. 481; *Morrisdale Coal Co.* v. *Pennsylvania R. R. Co.*, 230 U. S. 304, an assertion contained in the tariff, even if made in terms (as it was not), that the passenger does make such an agreement, still less an assertion that liability is limited, unless a contract is made, is neither a rate, a rule, a regulation, or a practice, and the question of its reasonableness can be raised in the courts. *Adams Exp. Co.* v. *Croninger*, 226 U. S. 491; *Chi., B. & Q. Ry. Co.* v. *Miller*, 226 U. S. 513; *Chicago, St. Paul &c. Ry. Co.* v. *Latta*, 226 U. S. 519; *Wells, Fargo & Co.* v. *Neiman-Marcus Co.*, 227 U. S. 469; *Kansas City Ry. Co.* v. *Carl*, 227 U. S. 639; *Mo., Kans. & Tex. Ry. Co.* v. *Harriman*, 227 U. S. 657, do not conflict with this; and see *Bernard* v. *Adams Exp. Co.*, 205 Massachusetts, 254; *Greenwald* v. *Barrett*, 199 N. Y. 170.

There is no discrimination between different travellers involved in the decision of the Massachusetts court. *Chicago & Alton R. R.* v. *Kirby*, 225 U. S. 155; *Kansas City So. Ry. Co.* v. *Carl*, 227 U. S. 639, 653. *Tex. & Pac. R. R. Co.* v. *Mugg*, 202 U. S. 242; *Gulf &c. R. R. Co.* v. *Hefley*, 158 U. S. 98, distinguished. And see *Merchants Press Co.* v. *Insurance Co.*, 151 U. S. 368, 388; *Judge* v. *Nor. Pac. Ry. Co.*, 189 Fed. Rep. 1014.

The consequences of upholding the contention of the plaintiff in error show that the contention must be erroneous. *Matter of Released Rates*, 13 I. C. C. 550.

The schedules filed make the defendant in error liable for the excess charge for value and the railroad liable for the full value of the baggage. *Matter of Released Rates,* 13 I. C. C. 550; *Kansas City So. Ry. Co.* v. *Carl,* 227 U. S. 639, 650.

There is no hardship upon the carrier in the decision below. The obligation imposed by that decision is no greater than that which everywhere existed prior to the passage of the Interstate Commerce Acts, and still exists as to intrastate shipments. *York County* v. *Central Railroad,* 3 Wall. 107, 113; *Squire* v. *N. Y. Central R. R.,* 98 Massachusetts, 239, 248; *Hill* v. *Boston &c. Railroad Co.,* 144 Massachusetts, 284.

The rule of the common law has not been changed in regard to such a case as the present. *Adams Exp. Co.* v. *Croninger,* 226 U. S. 491, 511; *Greenwald* v. *Barrett,* 199 N. Y. 170, 175; *Bernard* v. *Adams Exp. Co.,* 205 Massachusetts, 254, 259.

The statute does not diminish the liability for negligence imposed on the carrier by the common law. Such liability may be enforced in the state courts. *Louis. & Nash. R. R. Co.* v. *Cook Brewing Co.,* 223 U. S. 70.

MR. JUSTICE DAY delivered the opinion of the court.

Katharine Hooker brought an action in the Superior Court of Middlesex County, Massachusetts, to recover from the Boston & Maine Railroad as a common carrier on account of the loss of certain baggage belonging to her, which had been transported by the defendant in interstate commerce from Boston, Massachusetts, to Sunapee Lake station, New Hampshire, on September 15, 1908. The plaintiff recovered a judgment for the value of the baggage lost with interest. The case was taken to the Supreme Judicial Court of Massachusetts upon exceptions of the defendant, and upon its rescript, returned to the

Superior Court overruling the exceptions (209 Massachusetts, 598), judgment was there entered for the plaintiff for $2,253.77.

The defendant insists that the recovery of the plaintiff should have been limited to the sum of $100, in view of certain requirements made by it concerning the transportation of baggage and filed with the Interstate Commerce Commission. From the findings of fact it appears that the baggage was checked upon a first class ticket purchased for the plaintiff (although not used by her, she traveling upon another similar ticket purchased by herself); that at the time the baggage was checked the plaintiff had no notice of the regulations hereinafter referred to limiting the liability of the defendant (further than such notice is to be presumed from the schedules filed and posted as hereinafter stated); that no inquiry was made by the defendant on receiving the plaintiff's baggage as to its value; that there was no evidence that any more expensive or different mode of transportation was adopted for baggage the value of which was declared to exceed $100 than for other baggage; that any reasonable person would infer from the outward appearance of the plaintiff's baggage when tendered to the defendant for transportation that the value largely exceeded $100, and that the loss of plaintiff's baggage was due to the negligence of defendant.

The court further found that previous to and during September, 1908, the defendant had published and kept open for inspection and filed with the Interstate Commerce Commission, in accordance with the act of Congress relating to interstate commerce and amendments thereto and the orders and regulations of the Commission, schedules giving the rates, fares and charges for transportation between different points, including Boston and Sunapee Lake station, all terminal, storage and other charges required by the Commission, all privileges and facilities granted or allowed, and all rules or regulations

which in any way affected or determined such rates, fares and charges or the value of the service rendered to passengers; that during the same time, in accordance with an order of the Commission of June 2, 1908, making comprehensive regulations as to rate and fare schedules, the defendant had placed with its agent in Boston all rate and fare schedules and the terminal and other charges applicable to that station, and had enabled and required him to keep in accessible form a file of such schedules, and had instructed him to give information contained therein to all seeking it and to afford to inquirers opportunity to examine the schedules, and that the defendant in the manner shown and in all other ways conformed to the acts of Congress and the orders and regulations of the Commission with reference to such schedules. The court also found that the schedules contained provisions limiting the free transportation of baggage to a certain weight and the liability of the defendant to $100, followed by a table of charges for excess weight, and also contained the following provision:

"For excess value the rate will be one-half of the current excess baggage rate per one hundred pounds for each one hundred dollars, or fraction thereof, of increased value declared. The minimum charge for excess value will be 15 cents.

"Baggage liability is limited to personal baggage not to exceed one hundred dollars in value for a passenger presenting a full ticket and fifty dollars in value for a half ticket, unless a greater value is declared and stipulated by the owner and excess charges thereon paid at time of taking the baggage" (p. 600); that the excess charge for transporting baggage valued at $1,904.50 which was the value of the baggage lost, from Boston to Sunapee Lake station during September, 1908, according to the schedules, was $4.75; that notices were posted at or near the offices where passengers' tickets were sold in the Boston

station stating that tariffs naming the rates on interstate traffic were on file with the agent and would be furnished for inspection upon application, and that notices were posted in the baggage room of that station, in a conspicuous place and in sight of persons using the room for checking baggage, reading that personal baggage not exceeding $100 in value would be checked free for each passenger on presentation of a first class ticket and containing information with reference to excess weight. And the court further found that the plaintiff did not declare at the time her baggage was checked that it exceeded $100 in value and did not pay any charges for valuation in excess of that amount.

It is to be borne in mind that the action as tried and decided in the state court was not for negligence of the Railroad Company as a warehouseman for the loss of the baggage after its delivery at Sunapee Lake station, but was solely upon the contract of carriage in interstate commerce.

The Supreme Judicial Court of Massachusetts, in deciding the case, held that the Interstate Commerce Act did not in any wise change the common law rule, applicable in Massachusetts, that regulations of this character, limiting the amount of recovery for baggage lost, must be brought home to the knowledge of the shipper and assented to or circumstances shown from which assent might be implied. In reaching this conclusion that learned court relied upon the case of *Pennsylvania R. R. Co.* v. *Hughes*, 191 U. S. 477, in which case it was held that a State might apply its local law and policy to recovery for the loss of a horse shipped in interstate commerce from Albany, New York, to Cynwyd, in the State of Pennsylvania, and injured by the negligence of a carrier in the latter State, notwithstanding the bill of lading contained an express condition that the carrier assumed liability to the extent only of the agreed valuation in event of loss.

It was further held in the *Hughes Case* that the Interstate Commerce Act, in the respect then under consideration, had not enacted an exclusive rule upon which recovery might be had governing responsibility for loss, and that as the law then stood the State might enforce its own regulations authorized by statute or judicial decision as to responsibility for such negligence.

Since the decision in the *Hughes Case* the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, has been passed, and this court has held that by virtue of that act (particularly § 20, the Carmack Amendment) the subject of interstate transportation of property has been regulated by Federal law to the exclusion of the power of the States to control in such respect by their own policy or legislation. In this connection we may refer to the cases of *Adams Express Co. v. Croninger,* 226 U. S. 491; *Wells, Fargo & Co. v. Neiman-Marcus Co.,* 227 U. S. 469; *Kansas City Southern Ry. Co. v. Carl,* 227 U. S. 639; *Missouri, Kansas & Texas Ry. Co. v. Harriman,* 227 U. S. 657.

The cases in 226 and 227 U. S., it is true, involved liability for express or freight shipments made upon express receipts, bills of lading or separate contracts, showing on their face or by reference to tariffs the opportunity for valuation for the purpose of fixing the rate and liability, and the limitation appearing in such form of contract was declared to be valid and effectual to relieve the carrier from a greater liability than that therein expressed. But the court did not stop there: In *Adams Express Co. v. Croninger, supra,* p. 509, it said: "The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission." In *Kansas City Southern Ry. Co. v. Carl, supra,* p. 652, this court said: "The valuation the shipper declares determines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable,

and actual want of knowledge is no excuse. 'The rate when made out and filed, is notice, and the effect is not lost, although it is not actually posted in the station. *Texas & Pacific Railway* v. *Mugg*, 202 U. S. 242; *Chicago & Alton Ry.* v. *Kirby*, 225 U. S. 155. It would open a wide door to fraud and destroy the uniform operation of the published tariff rate sheets. When there are two published rates, based upon difference in value, the legal rate automatically attaches itself to the declared or agreed value. Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. . . (p. 654). To the extent that such limitations of liability are not forbidden by law, they become, when filed, a part of the rate." And in *Missouri, K. & T. R. Co.* v. *Harriman, supra,* this court said that the shipper was compelled to take notice of the rate sheets contained in tariff schedules, (p. 669), "not only because referred to in the contract signed by them, but because they had been lawfully filed and published. . . (p. 671) When the carrier graduates its rates by value and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate." In *Chicago, R. I. & P. Ry. Co.* v. *Cramer*, 232 U. S. 490, this court said, p. 493: "That rule of liability [the uniform rule established by the Hepburn Act] is to be enforced in the light of the fact that the provisions of the tariff enter into and form a part of the contract of shipment, and if a regularly filed tariff offers two rates, based on value, and the goods are forwarded at the low value in order to secure the low rate, then the carrier may avail itself of that valuation when sued for loss or damage to the property." And in *Great Northern Ry. Co.* v. *O'Connor*, 232

U. S. 508, this court said: "But so long as the tariff rate, based on value, remained operative it was binding upon the shipper and carrier alike and was to be enforced by the courts in fixing the rights and liabilities of the parties. The tariffs are filed with the Commission and are open to inspection at every station. In view of the multitude of transactions, it is not necessary that there shall be an inquiry as to each article or a distinct agreement as to the value of each shipment. If no value is stated the tariff rate applicable to such a state of facts applies. If, on the other hand, there are alternative rates based on value and the shipper names a value to secure the lower rate, the carrier, in the absence of something to show rebating or false billing, is entitled to collect the rate which applies to goods of that class, and if sued for their loss it is liable only for the loss of what the shipper had declared them to be in class and value."

Before these cases were decided this court had held that the effect of filing schedules of rates with the Interstate Commerce Commission was to make the published rates binding upon shipper and carrier alike, thus making effectual the purpose of the act to have but one rate, open to all alike and from which there could be no departure. *Gulf, Colorado and Santa Fe Ry.* v. *Hefley*, 158 U. S. 98; *Texas & Pac. Ry. Co.* v. *Mugg*, 202 U. S. 242; *Armour Packing Co.* v. *United States*, 209 U. S. 56, 81; *Louis. & Nash. R. R.* v. *Mottley*, 219 U. S. 467, 476. This principle it will be perceived was fully recognized in the series of cases decided since the passage of the Hepburn Act, beginning with the case of *Adams Express Co.* v. *Croninger*, *supra*. It is true that the Carmack Amendment requires a receipt or bill of lading to be issued concerning shipments of property in interstate commerce and that in the cases construing that amendment a bill of lading was issued, and according to the circumstances of the case the bill of lading and its effect are discussed in each of these, but the

effect of filing the schedule is not lost sight of and the doctrine of the previous cases as to the purpose of filing and the necessity of adherence to such schedule is uniformly recognized.

The court below, after conceding that the subject-matter of passenger's baggage in interstate travel is within the control of Congress, and saying that there was no specific regulation respecting it, said (p. 602):

"The precise position of the defendant is that as the limitation of liability for baggage was filed and posted as a part of its schedules for passenger tariff, the limitation thereby became and was an essential part of its rate, from which under the interstate commerce law it could not deviate, and by which the plaintiff was bound, regardless of her knowledge of or assent to it. If the premise is sound, then the conclusion follows, for the public are held inexorably to the rate published, regardless of knowledge, assent or even misrepresentation. *Gulf, Colorado & Santa Fe Railway* v. *Hefley,* 158 U. S. 98. *Texas & Pacific Railway* v. *Mugg,* 202 U. S. 242. *Melody* v. *Great Northern Railway,* 25 So. Dak. 606."

It follows therefore, from the previous decisions in this court, that if it be found that the limitation of liability for baggage is required to be filed in the carrier's tariffs, the plaintiff was bound by such limitation. Having the notice which follows from the filed and published regulations, as required by the statute and the order of the Interstate Commerce Commission, she might have declared the value of her luggage, paid the excess tariff rate and thus secured the liability of the carrier to the full amount of the value of her baggage, or she might, for the purpose of transportation, have valued it at $100 and received free transportation and liability to that extent only, or, as she did, she might have made no valuation of her baggage, in which event the rate and the corresponding liability would have automatically attached. As to the finding

that the plaintiff's baggage was apparently worth more than $100, as above set forth, it appears that the contents of the two trunks and suit case were not disclosed or known to the carrier, and the finding in this respect, necessarily based on the appearance of the baggage, cannot be said to show a procurement of transportation in violation of the requirements of the filed schedules at a rate disproportionate to its known value.

Let us now turn to the Interstate Commerce Act and see whether the matter of the limitation of baggage liability is covered by that act. Section 6 provides (as amended by § 2 of the Hepburn Act, June 29, 1906, c. 3591, 34 Stat. 584, 586):

"That every common carrier subject to the provisions of this Act shall file with the Commission created by this Act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or

consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this Act.

\* \* \* \* \* \* \* \*

"No carrier, unless otherwise provided by this Act, shall engage or participate in the transportation of passengers or property, as defined in this Act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this Act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. . . ."

It is to be observed that the schedules are required to state, among other things, in naming certain charges, "all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee." The question then is did the limitation as to liability for baggage based

upon the requirement to declare its value when more than $100 was to be recovered come within that provision.

It seems to us that the ordinary signification of the terms used in the act would cover such requirements as are here made for the amount of recovery for baggage lost by the carrier. It is a regulation which fixes and determines the amount to be charged for the carriage in view of the responsibility assumed, and it also affects the value of the service rendered to the passenger. Such requirements are spoken of, in decisions dealing with them, as regulations; as, a common carrier "may prescribe *regulations* to protect himself against imposition and fraud, and fix a rate of charges proportionate to the magnitude of the risks he may have to encounter." *York Co.* v. *Central R. R.*, 3 Wall. 107, 112. "It is undoubtedly competent for carriers of passengers, by specific *regulations*, distinctly brought to the knowledge of the passenger, which are reasonable in their character and not inconsistent with any statute or their duties to the public, to protect themselves against liability, as insurers, for baggage exceeding a fixed amount in value, except upon additional compensation, proportioned to the risk. And in order that such *regulations* may be practically effective and the carrier advised of the full extent of its responsibility, and, consequently, of the degree of precaution necessary upon its part, it may rightfully require, as a condition precedent to any contract for the transportation of baggage, information from the passenger as to its value; and if the value thus disclosed exceeds that which the passenger may reasonably demand to be transported as baggage without extra compensation, the carrier, at its option, can make such additional charge as the risk fairly justifies." *Railroad Co.* v. *Fraloff*, 100 U. S. 24, 27.

Mr. Justice Brewer, sitting in the Circuit Court, in *Ames* v. *Union Pac. Ry. Co.*, 64 Fed. Rep. 165, 178, thus defined the term regulation: "Within the term 'regulation'

are embraced two ideas: One is the mere control of the operation of the roads, prescribing the rules for the management thereof,—matters which affect the convenience of the public in their use. Regulation, in this sense, may be considered as purely public in its character, and in no manner trespassing upon the rights of the owners of railroads. But within the scope of the word 'regulation,' as commonly used, is embraced the idea of fixing the compensation which the owners of railroad property shall receive for the use thereof; and when regulation, in this sense, is attempted, it necessarily affects the property interests of the railroad owners; and it is 'regulation' in this sense of the term."

Turning to the act itself we think the conclusion that this limitation is a regulation required to be filed by the act is strengthened by section 22 [1] which provides: ". . . But before any common carrier, subject to the provisions of this act, shall issue any such joint interchangeable mileage tickets with special privileges, as aforesaid, it shall file with the Interstate Commerce Commission copies of the joint tariffs of rates, fares, or charges on which such joint interchangeable mileage tickets are to be based, *together with specifications of the amount of free baggage permitted to be carried under such tickets, in the same manner as common carriers are required to do with regard to other joint rates by section six of this act.*" This section would indicate that Congress thought that § 6 of the act had to do with specifications of the amount of baggage which would be carried free and that such regulations should be filed under the requirement of § 6 to which it referred.

This conclusion is further strengthened by the action of the Interstate Commerce Commission, in requiring by its Tariff Circular No. 15–A, entitled "Regulations Governing the Construction and Filing of Freight Tariffs and Classi-

---

[1] As amended by the Act of Feb. 8, 1895, c. 61, 28 Stat. 643.

fication and Passenger Fare Schedules," effective April 15, 1908, and in force at the time of the loss here in question, that:

"34. Tariffs shall contain, in the order named

"(g) Rules and regulations which govern the tariff, the title of each rule or regulation to be shown in bold type. Under this head all of the rules, regulations, or conditions which in any way affect the fares named in the tariff shall be entered. . . . These rules shall include . . . the general baggage regulations, and also schedule of excess-baggage rates, unless such excess-baggage rates are shown in tariff in connection with the fares."

This requirement is a practical interpretation of the law by the administrative body having its enforcement in charge, and is entitled to weight in construing the act.

The act of June 18, 1910 (c. 309, 36 Stat. 539, 546), defining, in §1, the duties of carriers to make just and reasonable regulations affecting, among other things, the carrying of personal, sample and excess baggage, may be noted in passing. This statute was before the Commission in a case involving such regulations. Regulations Restricting the Dimensions of Baggage, 26 I. C. C. 292. Concerning it the Commission, by Clark, Chairman, said (p. 293):

"Prior to June 18, 1910, the act to regulate commerce contained no specific provision relating to the interstate transportation of baggage, except in connection with the issuance of joint interchangeable mileage tickets. The Commission had, however, under authority of section 6, required carriers to publish and file their general baggage regulations and their schedules of excess-baggage rates. Section 1 was amended on the date named, the amendment, in so far as it is material, reading as follows:

"It is hereby made the duty of all common carriers subject to the provisions of this act to establish, observe,

and enforce . . . just and reasonable regulations and practices affecting classifications, . . . the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, . . . the carrying of personal, sample, and excess baggage.'"

And it is to be observed that the Commission considers its requirement with reference to including baggage regulations in the tariff schedules, quoted above, as adequate, for the same provisions appear in its current circular.

We are therefore of the opinion that the requirement published concerning the amount of the liability of the defendant based upon additional payment where baggage was declared to exceed $100 in value was determinative of the rate to be charged and did affect the service to be rendered to the passenger, as it fixed the price to be paid for the service rendered in the particular case, and was, therefore, a regulation within the meaning of the statute.

By requiring the baggage regulations, including the excess valuation rate, to be filed and become part of the tariff schedules, the rule of the common law that the carrier becomes an insurer of the safety of baggage against accidents not the act of God or the public enemy or the fault of the passenger (the rule established in this country, 3 Hutchinson on Carriers, § 1241) was not changed. The effect of such filing is to permit the carrier by such regulations to obtain commensurate compensation for the responsibility assumed for the safety of the passenger's baggage, and to require the passenger whose knowledge of the character and value of his baggage is peculiarly his own to declare its value and pay for the excess amount. There is no question of the reasonableness or propriety of making such regulations, which would be binding upon the passenger if brought to his knowledge in such wise as

to make an agreement or what is tantamount thereto. This much is conceded by the learned counsel for the plaintiff in error. The liability of a carrier under the Interstate Commerce Act was said, in the *Croninger Case* (226 U. S. p. 511), to be (aside from the responsibility for the default of a connecting carrier) "not beyond the liability imposed by the common law as that body of law applicable to carriers has been interpreted by this court as well as many courts of the States." And in that case (p. 509) it was laid down as the established rule of common law "as declared by this court in many cases that such a carrier may by a fair, open, just and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." And see the previous cases in this court there cited. But the effect of the regulations, filed as required, giving notice of rates based upon value when the baggage to be transported was of a higher value than $100, and the delivery and acceptance of the baggage without declaration of value or notice to the carrier of such higher value, charges the carrier with liability to the extent of $100 only.

The language of the regulation filed, reads: Baggage liability is limited to personal baggage not to exceed $100 in value, etc., unless a greater value is declared, etc. We have said that this limitation does not relieve from the insurer's liability when the loss occurs otherwise than by negligence, and we think applies equally when negligence of the carrier is the cause of loss, as is found in this case. The effect of the filing gives the regulation as to baggage the force of a contract determining "Baggage liability." In *Hart* v. *Pennsylvania R. R.*, 112 U. S. 331, 341, followed in the later cases in this court, it was held that a recovery may not be had above the amount stipulated though the loss results from the carrier's negligence. "The carrier

must respond for negligence up to that value." The discussion and conclusion reached in the *Croninger* and *Carl Cases, supra,* leave nothing to be said on this point. This rule is recognized in New York, *Tewes v. North German Lloyd S. S. Co.,* 186 N. Y. 151; *Gardiner v. N. Y. Central & H. R. R. R.,* 201 N. Y. 387.

If the charges filed were unreasonable, the only attack that could be made upon such regulation would be by proceedings contesting their reasonableness before the Interstate Commerce Commission. While they were in force they were equally binding upon the railroad company and all passengers whose baggage was transported by carriers in interstate commerce. This being the fact, we think the limitation of liability to $100 fixed the amount which the plaintiff could recover in this case, and there was error in affirming the recovery for the full value of the baggage, in the absence of a declaration of such value and payment of the additional amount required to secure liability in the greater sum.

We do not think the requirement of the Carmack Amendment, that a railway company receiving property for transportation in interstate commerce shall issue a receipt or bill of lading therefor, required other receipts than baggage checks, which it is shown were issued when the baggage was received in this case. When the Amendment was passed Congress well knew that baggage was not carried upon bills of lading, and that carriers had been accustomed to issue checks upon receipt of baggage. We do not think it was intended to require a departure from this practice when the matter was placed under regulation by schedules filed and subject to change for unreasonableness upon application to the Commission. Such checks are receipts, and there is no special requirement in the statute as to their form. It is doubtless in the power of the Interstate Commerce Commission to make requirements as to the checks or receipts to be given for baggage if that

subject needs regulation.   Act of June 18, 1910, §§ 1 and 15, c. 309, 36 Stat. 539.

> *Reversed and remanded to the Superior Court of Massachusetts for further proceedings not inconsistent with this opinion.*

MR. JUSTICE PITNEY, dissenting.

I have been unable to find a previous instance where any court, in this country at least, in an action by shipper or passenger against common carrier for loss of freight or baggage occasioned by the negligence of the carrier or its employés, has held the recovery to be limited to an arbitrary sum unrelated to the value of the goods lost, and this without any previous valuation or agreement assented to by the shipper or passenger, without any representation of value made by him, and without even notice brought home to him of any rule or regulation upon which the limitation of liability is based.   The effect given by the present decision to a "regulation" prescribed by the carrier, that while formally promulgated was in fact unknown to the passenger, seems to me an entire departure from the principles governing the duties and responsibilities of common carriers as heretofore recognized by this court and by the courts of the States generally, as laid down in the text-books and cyclopedias of law, and as reiterated and applied by this court in a recent series of notable decisions.

We are referred to the "Act to Regulate Commerce" of February 4, 1887, c. 104, 24 Stat. 379, as amended June 29, 1906 by the Hepburn Act, c. 3591, 34 Stat. 584, with citation of the provision in § 6 of the act respecting the filing and publication of schedules showing the rates, fares, and charges for transportation, etc., and with particular emphasis upon the so-called Carmack Amendment.   I do not find in either of these any phrase or expression that manifests a legislative intent to lessen or limit in any way

the carrier's liability as *quasi*-insurer, much less its responsibility for losses due to its own negligence or that of its employés.    Neither enactment in terms imposes any duty or burden upon the shipper or passenger affecting the question at issue; and the Carmack Amendment, at least, contains a clear expression of the legislative purpose to enforce the carrier's responsibility for losses of property caused by it, without regard to any rule or regulation exempting it.

The result reached in the present case—which seems so contrary to all previous adjudications and to the apparent meaning of the acts of Congress—is based (if I understand the opinion), not upon any legislation directly addressed to the particular subject, but upon inferences deduced by indirect reasoning from the assumed policy of the law.   The reasoning, as I am constrained to believe, disregards familiar principles established by repeated decisions of this court, in the light of which Congress undoubtedly legislated; and it has the effect of placing honest but unskilled shippers and passengers at a serious disadvantage in dealing with common carriers, enabling the latter, by "regulations" never called to the attention of the former, to obtain practical immunity from responsibility for losses due to their own negligence.

The consequences are so serious that I have been unable to convince myself that I should acquiesce in silence.

The salient facts are mentioned in the opinion, but some are not noticed, and it is proper to state that plaintiff traveled, in September, 1908, as an interstate passenger upon defendant's train from Boston, Massachusetts, to Sunapee Lake, New Hampshire, having in fact paid two first-class fares, one ticket being used for the checking of her baggage, the other for her personal transportation. Defendant's schedules, filed with the Interstate Commerce Commission and published in the mode prescribed by the act of Congress, showed the rates of fares between

these places, and contained a provision stating that "One hundred and fifty pounds of personal baggage, not exceeding one hundred dollars in value will be checked free for each passenger on presentation of a full ticket. . . . For excess weight, charge will be made as follows [here was inserted a table of charges for excess weights, and at the foot of it the following]: For excess value, the rate will be one-half of the current excess baggage rate per one hundred pounds for each one hundred dollars, or fraction thereof, of increased value declared. The minimum charge for excess value will be 15 cents. Baggage liability is limited to personal baggage not to exceed one hundred dollars in value for a passenger presenting a full ticket . . . unless a greater value is declared and stipulated by the owner and excess charges thereon paid at time of checking the baggage." Plaintiff's baggage consisted of three pieces, of the value of $1,904.50, and the charge on this valuation for transportation from Boston to Sunapee Lake, according to the schedules, would have been 25c for each excess $100 or fraction thereof, or $4.75 in all. Plaintiff did not declare and stipulate at the time the baggage was checked that it exceeded $100 in value, and did not pay any charge for valuation in excess of that amount. Defendant's agents did not request any such declaration, and made no inquiry respecting value; but it is found as a fact that from the outward appearance of the baggage when tendered to defendant for transportation any reasonable person would have inferred that its value largely exceeded $100. There was nothing to show that any more expensive or different mode of transportation was adopted for baggage whose value was declared to exceed $100 than for other baggage. Nor was there anything to show that plaintiff, or her agent who attended to the checking of the baggage for her, had notice of defendant's regulations for limiting its liability. In the Boston passenger station notices were posted that "Freight

and passenger tariffs naming rates on interstate traffic are on file with the agent, and will be furnished for inspection upon application;" and in the baggage room was a notice that "One hundred and fifty pounds of personal baggage not exceeding one hundred dollars in value will be checked free for each passenger on presentation of a full ticket." There was nothing in either of these notices to call attention to any charge for excess value, nor any statement in terms that the baggage liability was limited to one hundred dollars. Nor was it shown that the notices themselves were ever seen by plaintiff or her agent. It appears, however, that because the weight of her baggage exceeded by forty-five pounds the weight allowable under the company's rules, a payment of twenty-three cents was made for checking the baggage. Ordinary numbered baggage checks appear to have been delivered to plaintiff's agent, but nothing else in the form of a receipt or bill of lading. The baggage was not lost in transit, but was destroyed by fire while in defendant's charge, more than twenty-six hours after its arrival at defendant's Sunapee Lake Station. It was distinctly found as a fact than the loss was due to defendant's negligence.

In the trial court, plaintiff relied wholly upon a count of her declaration which, after reciting the status of defendant as a common carrier and the contract of carriage in interstate commerce, averred as ground of recovery the neglect and refusal of defendant to deliver the baggage to plaintiff at Sunapee Lake upon demand made, accompanied with a tender of the checks. But the course of the trial shows that negligence was a principal issue, if not the only vital issue; both parties requested findings upon the question, and findings were made in response to their respective requests; and upon review the state Supreme Court treated negligence as the asserted ground of liability, saying (209 Massachusetts, 599): "The plaintiff, an interstate passenger of the defendant, claims

damages in excess of $2,000 for loss of her baggage occurring through the negligence of the defendant."

Although, according to the well known Massachusetts doctrine, the railroad company's responsibility strictly as carrier would seem to have terminated with the completion of the transit and the safe deposit of the baggage in the railroad station, its responsibility thereafter being that of warehouseman, (*Thomas* v. *Boston & Providence Railroad Corp.*, 10 Met. 472, 477; *Norway Plains Co.* v. *Boston & Maine Railroad*, 1 Gray, 263, 273; *Barron* v. *Eldredge*, 100 Massachusetts, 455, 459; *Lane* v. *Boston & Albany Railroad Co.*, 112 Massachusetts, 455, 462; *Stowe* v. *New York &c. Railroad Co.*, 113 Massachusetts, 521, 523; *Rice* v. *Hart*, 118 Massachusetts, 201, 207); the distinction appears to have been ignored by the Massachusetts court in discussing the case, perhaps because it does not affect the responsibility for a loss of goods attributable to negligence; there being in this respect no difference between a carrier and a warehouseman. But it might affect the question whether defendant's responsibility is to be determined in the light of the Interstate Commerce Act; and I concede that it is.

It is of course true that in *Adams Express Co.* v. *Croninger*, 226 U. S. 491, this court held that by the Carmack Amendment (34 Stat. 595, set forth in the margin,[1]) the

---

[1] "That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: *Provided*, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

subject-matter of the liability of railroads under bills of lading issued for interstate freight is placed under .Federal regulation so as to supersede the local law and policy of the several States, whether .evidenced by judicial decision, by statute, or by state constitution.

And I concede that the Supreme Court of Massachusetts erred if it intended to hold that the carrier's responsibility for interstate passengers' baggage is not likewise within the sweep of the Amendment.

The concrete question, therefore, is whether under the Interstate Commerce Act and the Carmack Amendment this defendant's liability to plaintiff, upon the facts stated, is properly to be limited to one hundred dollars.

My views, in brief, are:

(a) That the baggage regulation limiting the liability to the amount named (if construed as operative without the knowledge or consent of the passenger, and in the absence of an actual valuation of the goods, assented to by the passenger), is not authorized or sanctioned by the Commerce Act, and is invalid because contrary to the established policy of the law governing the common carrier in the performance of its public duties, and because contrary to the letter and spirit of the Carmack Amendment.

(b) That the regulation had not received the approval of the Interstate Commerce Commission, but on the contrary was covered by an .adverse administrative ruling made by the commission a few months before the occur-,rences that gave rise to this action.

(c) That, being invalid *per se*, the regulation derived no legal force or vitality from being included in the filed and published schedules.

(d) That the filing of the regulation cannot give it the force of a contract, because (1) plaintiff was ignorant of the regulation in fact; (2) to make it a part of her contract without her knowledge would render it a contract limiting

the carrier's liability for negligence to an arbitrary sum, without any agreement or representation of value on the part of plaintiff, and therefore void as being contrary to established public policy; and (3) the law will not raise by implication an agreement that is contrary to the policy of the law.

(e) That plaintiff is not estopped to recover the full value of her goods, for she was entirely free from blame in the matter, made no representation as to value and sought no special advantage.

(f) That even were the contract of carriage as actually made, invalid, this would not render the bailment unlawful, and (at least) the carrier would be responsible for the loss of the goods through negligence, irrespective of the contract.

(g) That by the terms of the Carmack Amendment the railroad company in this case is precluded from setting up a limitation of liability, (1) because the limitation, as asserted against a passenger who was ignorant of the regulation and had made no contract under it, amounts to a rule or regulation for exempting the carrier from liability for a loss of property caused by the carrier's negligence, contrary to the terms of the Amendment; and (2) because the carrier waived any benefit of the regulation (if that were valid) by failing to deliver to plaintiff a receipt or bill of lading embodying the terms of the contract as required by the same enactment.

The importance of the subject seems to warrant a somewhat extended discussion.

(1.) Reference is made to § 6 of the Commerce Act as amended by the Hepburn Act; the portion relied upon being that which requires the filed and published schedules to state "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or con-

signee." In this respect the act has remained substantially unchanged since the amendment of March 2, 1889, c. 382, 25 Stat. 855, quoted in the margin.[1]

It is important to observe that § 6, either before or since the Hepburn act, *does not prescribe what the rules and regulations shall be.* Neither this section nor any other section of the act confers upon the carrier any authority over the subject. It is implied that there may be, indeed must be, rules and regulations for carrying on the business of a common carrier, in order to secure system, efficiency and a just performance of its public duties; and § 6, recognizing this, prescribes—and, as I think, only prescribes—that whatever rules and regulations may be duly established which "in any wise change, affect, or determine the rates, fares, and charges, or the value of the

---

[1] "Sec. 6 (as amended by § 1 of the act of March 2, 1889, c. 382, 25 Stat. 855). That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing *the rates and fares and charges for the transportation of passengers and property* which any such common carrier has established and which are in force at the time upon its route. *The schedules* printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and *shall contain* the classification of freight in force, and shall also state separately the terminal charges and *any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges.* Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. . . . And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

service rendered," shall be included in the filed and published schedules. But does it follow from this that the carrier may make any rules and regulations it chooses? Is the carrier to be a law unto itself? And, if not, what are the limitations upon its power? The answer, I think, is plain. The authority to establish rules and regulations, unless it arise from express legislative authority, is derived by implication from the necessities of the case, in view of the nature of the business, and is plainly subject to the limitation that the rules and regulations shall not be such as to contravene the letter or the policy of the law, nor such as to evade responsibility for the due performance of the public duties of the carrier.

This is a principle universally recognized from an early day by the courts of this country, and it lies at the foundation of the rule everywhere prevalent (differing, in this regard, from the rule that prevailed in England for a time prior to the Railway & Canal Traffic Act, 1854, 17 and 18 Vict., c. 31, § 7), that the carrier cannot limit his liability by any general regulation or published notice.

It is for this reason, primarily, that the regulation here in question,—"Baggage liability is limited to personal baggage not to exceed one hundred dollars in value . . . unless a greater value is declared," etc., if treated as intended to be effective without the knowledge or assent of the passenger, seems to me to be a regulation entirely beyond the power of the carrier to establish. The state reports are full of cases recognizing the principle, and applying and enforcing it with respect to the particular subject-matter now under consideration. It is not necessary, however, to go outside of our own reports, for this court from the beginning until now has constantly recognized and steadfastly enforced this limitation of the authority of the common carrier with respect to regulations of the same essential character as the one now in question.

Thus, in *New Jersey Steam Navigation Co.* v. *Merchants Bank*, 6 How. 344, the court held that the carrier could not by published notices seeking to limit its responsibility exonerate itself from the duties which the law annexed to its employment. And, dealing with an express stipulation, the court, by Mr. Justice Nelson (p. 382) said: "But admitting the right thus to restrict his obligation, it by no means follows that he can do so by any act of his own. *He is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public, limiting his obligation, which may or may not be assented to.* He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal. And we agree with the court in the case of *Hollister* v. *Nowlen* [19 Wend. 234, 247], that, if any implication is to be indulged from the delivery of the goods under the general notice, it is as strong that the owner intended to insist upon his rights, and the duties of the carrier, as it is that he assented to their qualification. The burden of proof lies on the carrier, and *nothing short of an express stipulation by parol or in writing should be permitted to discharge him from duties which the law has annexed to his employment.*"

In *York Co.* v. *Central Railroad*, 3 Wall. 107, 112, the court, speaking by Mr. Justice Field, said: "The law prescribes the duties and responsibilities of the common carrier. He exercises, in one sense, a public employment, and has duties to the public to perform. Though he may . . . prescribe regulations to protect himself against imposition and fraud, and fix a rate of charges proportionate to the magnitude of the risks he may have to encounter, he can make no discrimination between persons, or vary his charges for their condition or charac-

ter. He is bound to accept all goods offered within the course of his employment, and is liable to an action in case of refusal. He is chargeable for all losses except such as may be occasioned by the act of God or the public enemy. He insures against all accidents which result from human agency, although occurring without any fault or neglect on his part; and *he cannot, by any mere act of his own avoid the responsibility which the law thus imposes. He cannot screen himself from liability by any general or special notice, nor can he coerce the owner to yield assent to a limitation of responsibility by making exorbitant charges when such assent is refused.* The owner of the goods may rely upon this responsibility imposed by the common law, which *can only be restricted and qualified when he expressly stipulates for the restriction and qualification.* But when such stipulation is made, and it does not cover losses from negligence or misconduct, we can perceive no just reason for refusing its recognition and enforcement."

In *Railroad Co. v. Manufacturing Co.,* 16 Wall. 318, 329, the court, after repeating the language I have quoted from the opinion in 6 How., proceeded to say: "These considerations against the relaxation of the common law responsibility by public advertisements, *apply with equal force to notices having the same object,* attached to receipts given by carriers on taking the property of those who employ them into their possession for transportation. Both are attempts to obtain, by indirection, exemption from burdens imposed in the interests of trade upon this particular business. *It is not only against the policy of the law, but a serious injury to commerce to allow the carrier to say that the shipper of merchandise assents to the terms proposed in a notice, whether it be general to the public or special to a particular person, merely because he does not expressly dissent from them.* If the parties were on an equality in their dealings with each other there might be some show of reason for assuming acquiescence from silence, but in

the nature of the case this equality does not exist, and, therefore, every intendment should be made in favor of the shipper when he takes a receipt for his property, with restrictive conditions annexed, and says nothing, that he intends to rely upon the law for the security of his rights. *It can readily be seen, if the carrier can reduce his liability in the way proposed, he can transact business on any terms he chooses to prescribe. . . . The law, in conceding to carriers the ability to obtain any reasonable qualification of their responsibility by express contract, has gone as far in this direction as public policy will allow.*"

So in *Railroad Co.* v. *Fraloff*, 100 U. S. 24, 27, the court said: "It is undoubtedly competent for carriers of passengers, by *specific regulations, distinctly brought to the knowledge of the passenger, which are reasonable in their character and not inconsistent with any statute or their duties to the public*, to protect themselves against liability, as insurers, for baggage exceeding a fixed amount in value, except upon additional compensation, proportioned to the risk. And in order that such regulations may be practically effective, and the carrier advised of the full extent of its responsibility, and, consequently, of the degree of precaution necessary upon its part, *it may rightfully require, as a condition precedent to any contract for the transportation of baggage, information from the passenger as to its value;* and if the value thus disclosed exceeds that which the passenger may reasonably demand to be transported as baggage without extra compensation, the carrier, at its option, can make such additional charge as the risk fairly justifies."

(2.) And if it is against the policy of the law for a common carrier to limit its "common law liability"—that of *quasi*-insurer of goods—by general regulation or published notice not assented to by the passenger or shipper, this is more emphatically true with respect to its responsibility for losses due to the negligence of the carrier or of its servants; for, even by express contract, upon whatever

consideration, the carrier is not permitted to obtain exemption from liability for negligence. *New Jersey Steam Navigation Co.* v. *Merchants Bank*, 6 How. 344, 383; *York Co.* v. *Central Railroad*, 3 Wall. 107, 113; *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 375, 384; *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 174, 183.

The rule admits of but one exception, and that is hedged with important qualifications. It is, that where a contract of carriage is fairly made between shipper and carrier agreeing upon a valuation of the property carried, or based upon a valuation declared by the shipper and relied on by the carrier, with a rate of freight based upon a condition limiting the carrier's liability to the amount of the agreed or declared valuation, and the valuation is in good faith relied upon by the carrier and is not a mere cover for an attempt by the carrier to escape liability for negligence, the contract will be recognized as a proper mode of securing a due proportion between the amount for which the carrier is responsible and the freight he receives, and the shipper will be estopped from claiming more than the agreed or declared valuation, even in case of a loss due to negligence. So it was laid down by this court in *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331, 338, and the grounds of decision were expressed in the opinion of the court (by Mr. Justice Blatchford) in terms so clear that besides being uniformly followed by this court until now, they have been adopted generally by States that adhere to the common law rules of liability. To quote from the opinion (112 U. S. 340): "As a general rule, and in the absence of fraud or imposition, a common carrier is answerable for the loss of a package of goods though he is ignorant of its contents, and though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because he can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them.

*If the shipper is guilty of fraud or imposition, by misrepresenting the nature or value of the articles, he destroys his claim to indemnity, because he has attempted to deprive the carrier of the right to be compensated in proportion to the value of the articles and the consequent risk assumed, and what he has done has tended to lessen the vigilance the carrier would otherwise have bestowed* [Citing cases]. This qualification of the liability of the carrier is reasonable, and is as important as the rule which it qualifies. There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum that that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier. The effect of the agreement is to cheapen the freight and secure the carriage, if there is no loss; and the effect of disregarding the agreement, after a loss, is to expose the carrier to a greater risk than the parties intended he should assume. The agreement as to value, in this case, stands as if the carrier had asked the value of the horses, and had been told by the plaintiff the sum inserted in the contract. The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. *The shipper is estopped from saying that the value is greater.*"

(3.) Such was the state of the common law of this country, as universally recognized, when the Interstate Commerce Act was passed, and I am unable to see in § 6, or elsewhere in that act, any purpose to change it. During the entire time that intervened between the passage of the act and the passage of the Hepburn Act (including the Carmack Amendment) in 1906, the courts of the States

(except in the few States that adopted a policy less favorable to the carrier), and the Federal courts generally, administered the law as before, and without a suggestion, so far as I have observed, that § 6, in requiring that all rules and regulations having a bearing upon rates should be filed and published, had in any way authorized common carriers by any mere rule or regulation, although properly promulgated, to limit the liability for damages by negligence in the absence of an express agreement as to value assented to by the shipper, or some representation of value made by him.

Indeed, this court, in the recent case of *Pennsylvania Railroad* v. *Hughes*, 191 U. S. 477, 488, held that § 6, as it stood after the amendment of March 2, 1889, and before the Hepburn Act, did not amount to a regulation of the matter of a limitation of the carrier's liability to a particular sum in consideration of lower freight rates for transportation. To quote from the opinion (pp. 487, 488): "It may be assumed that under the broad power conferred upon Congress over interstate commerce as defined in repeated decisions of this court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier to limit its liability to a particular sum in consideration of lower freight rates for transportation. But upon examination of the terms of the law relied upon we fail to find any such provision therein. The sections of the interstate commerce law relied upon by the learned counsel for plaintiff in error, 24 Stat. 379, 382; 25 Stat. 855, provide for equal facilities to shippers for the interchange of traffic; for non-discrimination in freight rates; *for keeping schedules of rates open to public inspection; for posting the same in public places, with certain particulars as to charges, rules and regulations;* . . . giving remedies for the enforcement of the foregoing provisions, and providing penalties for their violation. . . . While under these provisions it may be said that Congress

has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, *we look in vain for any regulation of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuations,* and, until Congress shall legislate upon it, is there any valid objection to the State enforcing its own regulations upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage?"

This query was by the decision answered in the negative. And as a result, notwithstanding § 6 of the Commerce Act, the courts of Pennsylvania were left free to disregard the rule laid down in *Hart* v. *Pennsylvania Railroad* and to follow their own declared doctrine denying the right of a common carrier to limit its liability for losses due to negligence, even by a special agreement including a valuation assented to by the shipper. In this respect the situation was changed by the Carmack Amendment to the Hepburn Act, but not (so far as I can see) by any of the changes made in § 6 by that act.

(4.) And I had supposed that since as before the Carmack Amendment, under the decisions of this court in *Adams Express Co.* v. *Croninger,* 226 U. S. 491, and the other cases that have followed it along the same line, the general rules of law that disabled the common carrier from establishing regulations for limiting its liability by general notice not brought home to the shipper, and debarred the carrier from limiting its liability for losses due to negligence except by a special agreement including a fair valuation assented to by the shipper, had remained in full force and vigor, and indeed by the effect of the Amendment had been made the exclusive rule of conduct for interstate carriers by rail. For the *Croninger Case* not only held (negatively) that the Amendment superseded state laws upon the subject, but (affirmatively)

that in matters not covered by its own express terms it had the effect of establishing the common law rules respecting the carrier's liability, as laid down in previous decisions of this court, and adopted generally by the Federal courts.  To quote from the opinion (p. 504): "Prior to that amendment the rule of carrier's liability, for an interstate shipment of property, as enforced in both Federal and state courts, was either that of the general common law as declared by this court and enforced in the Federal courts throughout the United States, *Hart* v. *Pennsylvania Railroad,* 112 U. S. 331; or that determined by the supposed public policy of a particular State, *Pennsylvania Railroad* v. *Hughes,* 191 U. S. 477; or that prescribed by statute law of a particular State, *Chicago &c. Railroad* v. *Solan,* 169 U. S. 133.  Neither uniformity of obligation nor of liability was possible until Congress should deal with the subject. . . ."  (Page 505): "That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character.  It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract.  Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. . . ."  (Page 507): "But it has been argued that the non-exclusive character of this regulation is manifested by the proviso of the section, and that state legislation upon the same subject is not superseded, and that the holder of any such bill of lading may resort to any right of action against such a carrier conferred by existing state law.  This view is untenable.  It would result in the nullification of the regulation of a national subject and operate to maintain the confusion of the diverse regulation which it was the purpose of Congress

to put an end to.  .  .  .  *To construe this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing Federal law at the time of his action, gives to it a more rational interpretation* than one which would preserve rights and remedies under existing state laws, for the latter view would cause the proviso to destroy the act itself."

It was upon this construction of the act that we proceeded to determine the validity of the provision in the receipt or bill of lading there in question, which limited the liability of the carrier to the agreed value of $50; and we applied thereto the familiar rules to which I have already referred.   Thus (p. 509): "That a common carrier cannot exempt himself from liability for his own negligence or that of his servants is elementary.   *York Mfg. Co.* v. *Illinois Central Railroad*, 3 Wall. 107; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 174; *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331, 338.   The rule of the common law did not limit his liability to loss and damage due to his own negligence, or that of his servants.   That rule went beyond this and he was liable for any loss or damage which resulted from human agency, or any cause not the act of God or the public enemy.   *But the rigor of this liability might be modified through any fair, reasonable and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants.*   The inherent right to receive a compensation commensurate with the risk involved the right to protect himself from fraud and imposition by reasonable rules and regulations, and the right to agree upon a rate proportionate to the value of the property transported.   It has therefore become *an established rule of the common law as declared by this court in many cases that such a carrier may by a fair, open, just and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value made for the*

*purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk."*

The other decisions that have followed the *Croninger Case (C., B. & Q. Railway v. Miller,* 226 U. S. 513; *Chicago, St. P. &c. Ry. v. Latta,* 226 U. S. 519; *Wells, Fargo & Co. v. Neiman-Marcus Co.,* 227 U. S. 469; *Kansas City Southern Ry. Co. v. Carl,* 227 U. S. 639; *Mo., Kans. & Tex. Ry. Co. v. Harriman,* 227 U. S. 657; *Chicago, R. I. & Pac. Ry. Co. v. Cramer,* 232 U. S. 490; *Great Northern Railway v. O'Connor,* 232 U. S. 508), have simply applied the doctrine therein laid down, under varying circumstances.

In each of these cases there was a special contract, held by the court to have been fairly made, and to amount to a valuation by the shipper of the goods in question for the purposes of the shipment. In short, the court in each instance applied the rule of liability laid down in *Hart v. Pennsylvania Railroad, supra.*

(5.) Because of this firmly established policy of the law respecting the carrier's responsibility for the consequences of his negligence, I should have construed the "regulation" in question, limiting the baggage liability to $100, in subordination to that policy. According to the canon uniformly applied in construing statutes, that of giving them no meaning beyond that which the legislature may constitutionally enact, I should have construed the baggage regulation as a formula for standardizing the contracts proposed to be made by the carrier with the assent of passengers; not that the formula of itself constituted a substitute for a contract, or was intended to become binding upon the passenger until directly brought to his notice and in some way consciously assented to by him.

But my brethren construe it as binding in the absence of any knowledge or assent on the part of the passenger. So considered, I deem it void as being a regulation that was beyond the power of the common carrier to adopt. And if I am right about this, the fact that it was included

in the filed and published schedules does not in the least add to its efficacy.

It is not a question of mere unreasonableness. A carrier may resort to practices that are so clearly unwarranted by law as to require no preliminary application to the Commission, and that not even the sanction of the Commission could validate. I think the attempt to enforce, *ex parte,* such a limitation of liability is in that category.

(6). But, in fact, the Commission had distinctly ruled against the validity of the regulation in question, construed as the court now construes it; and had done this prior to the time this action arose.

I find nothing savoring of approval in Paragraph 34(g) of Tariff Circular No. 15A, effective April 15, 1908. The reference to "Excess-baggage rates" is to charges for excess weight, as I think sufficiently appears from 26 I. C. C. 292. But, if intended to apply to excess value, it does not suggest that a limitation of liability for losses attributable to negligence, effective without the knowledge or consent of the passenger, is to be made a part of such regulations.

And in *Matter of Released Rates,* 13 I. C. C. 550, decided May 14, 1908, the Commission, after full hearing and consideration, made an administrative interpretation of the Carmack Amendment, holding distinctly that it did not abrogate the law of the *Lockwood Case,* 17 Wall. 357, and the *Hart Case,* 112 U. S. 331. Among other rules laid down (Mr. Commissioner Lane writing), were these (p. 553): "(b) When the shipper has placed upon his goods a specific value, the carrier accepting the same in good faith as their real value, the rate of freight being fixed in accordance therewith, the shipper cannot recover an amount in excess of the value he has disclosed, even when loss is caused by the carrier's negligence," [citing the *Hart Case,* and quoting in italics from the opinion to the effect that under the circumstances disclosed "*the shipper is estopped*

*from saying that the value is greater"*]. And again (p. 554):
"The same principle is applicable when the shipper has in
some other way concealed the nature or the value of his
goods in order to secure a lower rate of freight. . . .
It does not appear that this principle is in any respect in
derogation of the provisions of § 20 [meaning the Car-
mack Amendment]. The carrier is made liable 'for any
loss, damage, or injury,' and 'no contract, receipt, rule,
or regulation shall exempt such common carrier, railroad
or transportation company from the liability hereby im-
posed.' But it is of the highest importance to note that,
this limitation is not secured by contract or notice—the
contract has no validity *per se*. It is only right that a
carrier who has acted in good faith should be protected
against the frauds and misrepresentations of the shipper,
and the law accomplishes this through the operation of
the principle of estoppel. The shipper is estopped from
recovering an amount in excess of the declared value,
and the rule is in perfect harmony with the law as it
stands to-day. 6 Cyc. of Law & Proc., title "Carriers,"
p. 401, note 5. (c) *If the specified amount does not purport
to be an agreed valuation, but represents an attempt on the
part of the carrier to limit the amount of recovery to a fixed
sum, irrespective of the actual value, the stipulation is void
as against loss due to the carrier's negligence or other mis-
conduct.* Much confusion has arisen from failure to dis-
tinguish between this situation and the situation com-
prehended in *Hart* v. *Pennsylvania Railroad Co., supra.*
That decision was expressly predicated upon the principle
of estoppel; the shipper had misrepresented the value of
his property, and had thereby secured the benefit of a
lower rate than he was properly entitled to by virtue
of the real value. He was estopped by his fraudulent
conduct from recovering an amount in excess of the value
he had declared. In the case we are now considering, the
requisites of estoppel are wanting. An estoppel cannot

arise unless the party invoking it has been the victim of misrepresentation, and has himself acted in good faith. Can it possibly be argued that when a carrier has arbitrarily placed in its bill of lading a stipulation limiting the amount of its liability, regardless of the actual value of the property, it may claim the benefit of an estoppel? Obviously not; it has not acted in good faith, neither has it been the victim of misrepresentation." And again, (p. 556): "(d) *If the specified amount, while purporting to be an agreed valuation, is in fact purely fictitious, and represents an attempt to limit the carrier's liability to an arbitrary amount, liability for the full value cannot be escaped in event of loss due to negligence.* This situation is substantially identical with that just considered—the difference is one in form only."

(7.) In the *Hart Case,* 112 U. S. 331, the fundamental ground of decision, as appears from what has been quoted from the opinion, was that since the shipper had entered into a special agreement for the purpose of cheapening the freight *he was estopped from saying that the value of the goods was greater than the value represented by him for the purposes of the agreement.* So, also, in the *Croninger Case,* and the other recent cases referred to, *estoppel was the ground of decision,* as the opinions clearly show (226 U. S. p. 510, bottom; 227 U. S. p. 476, top; 227 U. S. p. 651, top; 227 U. S. p. 668, bottom). When participating in these decisions, I, for one, so understood them. In each case the principle of estoppel is essential to the reasoning. In the *Carl Case* (227 U. S. p. 651), it was said: "When a shipper delivers a package for shipment and declares a value, either upon request or voluntarily, and the carrier makes a rate accordingly, the shipper is estopped upon plain principles of justice from recovering, in case of loss or damage, any greater amount. The same principle applies if the value be declared in the form of a contract. If such a valuation be made in good faith for

the purpose of obtaining the lower rate applicable to a shipment of the declared value, there is no exemption from carrier liability due to negligence forbidden by the statute when the shipper is limited to a recovery of the value so declared. The ground upon which such a declared or agreed value is upheld is that of estoppel." [Citing the *Hart Case* upon this precise point.] And in the *Harriman Case* (227 U. S. p. 668), the topic is summed up as follows: "The ground upon which the shipper is limited to the valuation declared is that of estoppel, and presupposes the valuation to be one made for the purpose of applying the lower of two rates based upon the value of the cattle. This whole matter has been so fully considered in *Adams Express Co.* v. *Croninger*, 226 U. S. 491, and *Kansas City Southern Railway* v. *Carl*, just decided, that we only need to refer to the opinions in those cases without further elaboration."

That these decisions are inconsistent with the theory that the mere act of including the regulations upon the subject in the filed schedules would operate to limit the liability of the carrier, without any representation or agreement as to value, assented to by the shipper, seems to me equally clear. Although in each case the relation of the rate differential to the question of valuation was brought home to the shipper, so that it appeared that the shipper had actual notice of the regulation upon the subject contained in the filed and published schedules, it was not suggested that the mere existence of such a regulation, coupled with the fact that the shipment was made at the more advantageous freight rate, had the effect of limiting the liability of the carrier in the event of a loss attributable to negligence. On the contrary, while the relation of the rate differential to the valuation was discussed, it was treated as merely showing that there was consideration for the agreement made by the shipper limiting the responsibility of the carrier, and as showing

the reasonableness of that agreement and the grounds of the estoppel that grew out of it. It was in each case plainly implied, if not expressed, that some representation or valuation, consciously assented to by the shipper, was essential to the limitation of the carrier's liability.

In the present case there is no ground for an estoppel against the plaintiff. She made no representation of any kind, her silence being attributable to her ignorance of the existence of the baggage regulation. No. estoppel arises where the conduct of the party sought to be estopped is due to ignorance founded upon an innocent mistake; and the same is more evidently true when the innocent party is silent because not asked to speak and unaware that there is occasion—much less, duty—to speak. There is, I think, no support in reason or authority for holding that a person acting in good faith but in ignorance of his rights or of the rights of the other party, should be estopped on the ground of knowledge imputed to him by a mere fiction of the law. It is only when good faith requires one to speak that silence estops him; and in the findings of fact in this case there is not the slightest ground to attribute to the plaintiff any want of good faith. Estoppel *in pais* presupposes an actual fault or a culpable silence. *Merchants Bank* v. *State Bank*, 10 Wall. 604, 605; *Morgan* v. *Railroad Co.*, 96 U. S. 716, 720.

And it seems sufficiently obvious that the railroad company did not in any wise rely upon plaintiff's silence to its disadvantage. There would, I think, be more reason for holding the company itself estopped, because it, and not the plaintiff, had knowledge of the baggage regulation; and, according to the findings, it was charged with notice that the baggage was worth much more than one hundred dollars; and the circumstances appearing from the facts as found, clearly indicate that plaintiff, through her agent, in effect tendered herself ready and willing to pay for her fare and baggage charges whatever was proper under the

circumstances; and the company set its own price for the service it was to render.

When the carrier was thus applied to by one of the traveling public for the performance of a transportation service in the line of its public duty, without any intimation that anything less than the full measure of the carrier's responsibility would be accepted, it was the carrier's duty, I think, according to principles hitherto recognized, to quote a rate commensurate with the service demanded, including an unlimited responsibility where nothing less was mentioned. If the law required it to charge a higher rate for unlimited than for limited responsibility, it was its duty to quote such higher rate. Having failed to do this, it ought not afterwards to be permitted to take advantage of its own wrong. In view of the Commerce Act, I do not think the carrier, under such circumstances, is estopped from afterwards claiming the additional compensation that it ought to have exacted when quoting the rate. But I do think it ought to be held estopped from setting up any limitation of its responsibility, when no such limitation was in the contemplation of the patron on demanding the service.

(8.) As I read the Interstate Commerce Act, it expresses in its own terms the extent of the prohibition of special contracts of carriage. As has often been said, the main purpose of the act was to prevent discrimination, and the filing of the schedules is the principal means to that end. Section 6, as amended in 1906 (34 Stat. 587, c. 3591), prohibits the carrier from transporting passengers or property unless the rates, fares, and charges upon which the same are transported have been filed and published in accordance with the act; from charging or collecting a different compensation for such transportation or for any service in connection with it than as specified in the tariff; and from refunding or remitting in any manner or by any device any portion of the specified rates; or ex-

tending to any shipper or person any privileges or facilities except such as are specified in the tariff. When, therefore, a carrier has established and promulgated its tariff, with regulations as to service such as it has a lawful right to establish, the effect of § 6 is to render unlawful any special contract of carriage made in contravention of the rates and regulations thus standardized in accordance with the law. Such is the effect of § 6 of the act, and it was held to have that effect before the passage of the Hepburn Act. *Gulf, Colorado &c. Ry.* v. *Hefley* (1895), 158 U. S. 98; *Texas & Pacific Ry.* v. *Mugg* (1906), 202 U. S. 242; *Chicago & Alton R. Co.* v. *Kirby*, 225 U. S. 155. All of these cases arose before the Hepburn Act, and the decisions were based upon § 6 of the act of February 4, 1887, c. 104, 24 Stat. 379, as amended by act of March 2, 1889, c. 382, 25 Stat. 855 (set forth above in the margin), which required the carrier to print and publicly post at each station for the inspection and information of the public the schedules of fares and rates for carriage of passengers and property, and provided that it should be unlawful for the carrier to depart from the published schedules; and upon the third section of the original act, which made it unlawful to give any undue or unreasonable preference or advantage to any particular shipper. In the *Hefley Case* the question decided was simply that a statute of Texas imposing a penalty for a failure to deliver goods on tender of the rate named in the bill of lading was not applicable to interstate shipments. But the effect of the decision was to declare that one who had obtained from a common carrier transportation of goods from one State to another at a rate specified in the bill of lading, but less than the published schedule of rates filed with and approved by the Interstate Commerce Commission and in force at the time, whether he did or did not know that the rate obtained was less than the scheduled rate, was not entitled to recover the goods upon the tender of payment

of the amount of charges named in the bill of lading, or of any sum less than the scheduled rates; in other words, that a special contract inconsistent with the published tariff could not avail. This principle was adopted as the ground of decision in the *Mugg Case.* And in the *Kirby Case,* likewise, it was held that as the broad purpose of the act was to compel the establishment of reasonable rates and their uniform application, a special contract by which advantage was given to a particular shipper could not be enforced. The distinction between a ground of action based upon the breach of such a special contract and one based upon the carrier's liability for negligence was clearly recognized in the opinion (225 U. S. p. 166), and the latter ground of liability rejected because not presented by the record. To the same effect is *Louisville & Nashville R. R.* v. *Mottley,* 219 U. S. 467, 476, which arose after the Hepburn Act.

These cases rest fundamentally upon the ground that to allow the shipper to have the benefit of a special agreement for lower rates or for better service than the standard rates and service prescribed by the published schedules would in effect compel the carrier to violate the provisions of the act. In this sense, and to this extent, all shippers are "bound" by the provisions of the act that bind the carrier. But to say that because of this a shipper or a passenger who has made no special contract at all, and claims the benefit of none, shall be conclusively deemed to have made a special contract, involving terms and conditions of which he was wholly ignorant, strikes me as a manifest *non sequitur.* And to hold that a passenger whose rights rest not upon any contract of shipment, but upon the negligence of the carrier, shall be barred from recovering full redress for the consequences of that negligence, upon the theory that he has unconsciously attempted to make a special contract in contravention of the act, is, I submit with respect, equally illogical. It seems also a

complete reversal of the *Hart Case* and the *Croninger Case*,—which declare that a carrier's liability for negligence can only be limited by such a contract or representation as shall estop the shipper,—to now hold that without any express contract or representation by the shipper the liability is limited, on the theory that he is legally charged with notice of requirements of which he was in fact ignorant.

It is true that in the case at bar, the Supreme Court of Massachusetts (209 Massachusetts, at p. 602) unnecessarily, and, as I think, erroneously, conceded that if the regulation limiting the baggage liability to one hundred dollars in value was so related to the rates of transportation of passengers as to be a part of such rate, the plaintiff was "bound," regardless of her knowledge or assent, and therefore her recovery in this action would be limited accordingly. The error, as it seems to me, arose from a misconception of the effect of the decisions in the *Hefley* and *Mugg Cases*. The fallacy, if I am correct in deeming it to be such, lies in the double sense of the word "bound." I respectfully suggest that this court, in a matter of such far-reaching importance, ought not to accept the concession without testing its soundness.

If it were said that because she did not know of, and therefore did not assent to, a limitation of liability to $100, she remained still liable to pay to the railroad company the amount of money properly chargeable for the excess of valuation, and that the company had a lien upon the baggage for this amount on its arrival at destination, I could see the force of the suggestion. This would, perhaps, be within the doctrine of the *Hefley* and *Mugg Cases*. (Of course, I do not mean to say that the lien would survive after the goods were lost through the company's negligence.) But I can find nothing in any of the cases referred to that lends support to the view that a railroad company can limit its liability by limiting the rate charged,

without according to the shipper or passenger any voice in the matter.

The expressions employed in the *Carl Case* (227 U. S. p. 652), that "The valuation the shipper declares determines the legal rate where there are two rates based upon valuation," and that "When there are two published rates, based upon difference in value, the legal rate automatically attaches itself to the declared or agreed value," had reference to the effect of a voluntary declaration made by a shipper who fixes the valuation of his goods for the purposes of the shipment, knowing that the valuation determines the rate that must be charged, although perhaps unaware what the precise rate may be. The same is true of similar language used in the *Harriman Case* (227 U. S. at p. 669), the *Cramer Case* (232 U. S. at p. 493), and the *O'Connor Case* (232 U. S. at p. 515). I am unable to see that the reasoning applies to the case of a shipper or passenger who has declared no valuation, has exercised no choice, and is unaware that a choice is open.

To say that constructive notice of the filed regulation, of which plaintiff was in fact ignorant, gave her an actual opportunity to declare the value of her baggage, pay the excess tariff rate, and thus secure the liability of the carrier to the full amount of her baggage, is to say that a fiction is the same as a fact.

(9.) In the *Croninger Case*, and the others of the same class, the shipper consciously accepted a benefit in the form of a reduced freight charge as the consideration of an agreement voluntarily made valuing the goods for the purposes of the shipment. But here the plaintiff did nothing of the kind. She paid the full price asked by the carrier for transportation of herself and her baggage, unaware of any regulation of the carrier that would require the payment of an additional charge for an unlimited liability for baggage. If she were setting up and relying upon any special contract made in violation of the law,

the doctrine of the *Hefley, Mugg* and *Kirby Cases* would apply. But her cause of action is complete without resort to any contract, special or general; and the contract of which her passage tickets and the baggage checks were the tokens, was merely the medium by which the carrier became possessed of her baggage. Having that baggage in its possession, the responsibility of the carrier for the exercise by itself and its employés of reasonable care for the safety of the goods arose under general principles of law independent of the contract; and those general principles as administered in the Federal courts (the same as in the courts of Massachusetts), entitled her to compensation upon the basis of the actual value of the goods lost, in the absence of a special agreement or of some representation of value made by her, limiting that liability.

Conceding, for argument's sake, that the contract of carriage as made between plaintiff and defendant, if deemed to import responsibility for the entire value of the baggage, was invalid because not made in accordance with the regulations filed and published in connection with the rate schedules, and because of the provisions of the Interstate Commerce Act that in effect forbid the making of contracts otherwise than in accord with those schedules,— even so, the plaintiff was in no wise at fault. She was unaware that she was at liberty to exercise any option, to say nothing of being under an obligation to do so. The fault was wholly with defendant, for it made no inquiry respecting the value of her baggage, and gave her no notice of any limitation of liability, although itself charged with notice from the very appearance of the baggage that it must have been worth more than $100. And her present action is based upon the carrier's negligence, and not upon an affirmance of the contract.

Irrespective of the contract, the carrier, like any other bailee for hire, was bound to take reasonable care to preserve the property ready for delivery to its owner. I can

find nothing in the letter or the spirit of the Commerce Act that forfeits her property or any part of its value because of her violation of the act, supposing her to have violated it. And since, through the carrier's negligence, the property was lost, it follows, on general principles, that her right of action, upon grounds independent of the contract, remains; it being based upon the general obligation of the bailee to do justice. The principle is fundamental and familiar, and has been applied in a great variety of cases. *Planters Bank* v. *Union Bank*, 16 Wall. 483, 500; *Philadelphia, W. & B. R. Co.* v. *Philadelphia Towboat Co.*, 23 How. 209, 217; *Spring Co.* v. *Knowlton*, 103 U. S. 49, 58; *Armstrong* v. *American Exchange Bank*, 133 U. S. 433, 466; *Logan County Bank* v. *Townsend*, 139 U. S. 67, 75; *Pullman's Car Co.* v. *Transportation Co.*, 171 U. S. 138, 151. And see *Newbury* v. *Luke*, 68 N. J. Law, 189, 191; *Dunlop* v. *Mercer*, 156 Fed. Rep. 545, 555; *In re Bunch Co.*, 180 Fed. Rep. 519, 527.

In *Merchants Cotton Press Co.* v. *N. A. Insurance Co.*, 151 U. S. 368, 388, this court held that while an agreement for special rates, rebates, or drawbacks was void under the Interstate Commerce Act, the law did not make the contract of affreightment otherwise void, nor prevent liability on the part of the carrier for the freight received; that such a construction would encourage rather than discourage unlawful agreements for rebates, since the carrier might prefer them to a liability for the freight; and that although the contract for rebate was void and unenforceable, the shipper could nevertheless recover for loss of his freight through the carrier's negligence. This decision has never been overruled or qualified, and it seems to me quite decisive of the present question.

(10.) Thus far I have treated the case as one arising under the common law rules respecting the carrier's liability, as laid down in the decisions of this court and adopted generally by the Federal courts. I have en-

deavored to show that a limitation of the carrier's liability is not permitted except it result from some actual representation or contract consciously assented to by the shipper, valuing the goods for the purposes of the shipment; that the sole ground for limiting the responsibility to this extent is that the shipper is estopped by his contract or his representations; that no different result is to be derived by any implication from the provisions of § 6 of the Interstate Commerce Act, which merely prevents the making of a special agreement inconsistent with the schedules, and does not compel the assumption (contrary to the fact) that a special agreement was made in conformity to them; that an agreement inconsistent with the schedules, even if void in itself, does not make the contract of affreightment otherwise void, nor prevent liability on the part of the carrier for loss of the goods attributable to its negligence; and that a shipper who has acted in good faith is not to be estopped upon the theory that a fiction or presumption of knowledge is equivalent to actual knowledge, or amounts to the same as conscious misrepresentation.   I have hitherto refrained from attributing any special force to the Carmack amendment as regulative of the subject-matter.

But let us now consider the specific force of that amendment (34 Stat. 584, p. 595, c. 3591, § 7, quoted in full in the marginal note, *ante*, p. 126).   It declares (*inter alia*) that a railroad company receiving property for interstate transportation "shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it   .  .   .  , and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed." It was concerning this provision that the court said in the *Croninger Case*, speaking by Mr. Justice Lurton, 226 U. S. p. 505: "That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character.   It em-

braces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract." This was equivalent to saying that because the carrier was obliged to issue to the shipper a receipt or bill of lading for the goods, and because the terms of the contract of carriage and rules and regulations pertaining thereto are presumably embodied in the receipt or bill of lading, therefore the act must be deemed an exercise by Congress of its general and exclusive power over the subject-matter.

And the language of the enactment shows that it was framed in view of the general and familiar practice of embodying in the receipt or bill of lading all the terms of the contract, including the valuation of the goods and the rules and regulations for limiting the liability of the carrier. Is it not perfectly manifest that when Congress declared that the carrier "shall issue a receipt or bill of lading" it intended that this document should embody the "contract, receipt, rule, or regulation" that are mentioned in the same clause? Is it possible, without twisting the words from their plain meaning, to read this so that the duty of the carrier shall be performed if it issues a receipt or bill of lading that does not evidence the contract between the parties, and the whole of that contract?

But in the present case there was no receipt or bill of lading within the meaning of the Carmack amendment as thus interpreted. There was nothing but three baggage checks, each bearing an identifying number, but, so far as the case shows, nothing else. I cannot agree that the statute leaves the carrier free to give a mere identifying token, instead of a "receipt or bill of lading." But, if I am wrong in this, it seems too clear for argument that so far as the carrier intends that any of its rules or regulations respecting its responsibility for the baggage are to be imported into the contract, it is incumbent upon it to set

them forth plainly in a bill of lading delivered to the shipper or passenger. If the act admits of the construction that a mere identifying token or check can be used in the place of a formal receipt or bill of lading, it for that reason must require the construction that the carrier may, and that he does thereby, waive the benefit and protection of the rules and regulations. For I cannot believe that the Carmack amendment is open to the construction that the shipper shall be bound by special terms or conditions respecting anything pertaining to the contract of carriage and the carrier's responsibility, while the shipper is in fact ignorant of them. This would leave the carrier free to set a trap for the innocent shipper or passenger. Nor can I agree that the act requires any affirmative regulation by the Interstate Commerce Commission prescribing the form of receipts to be given for baggage. I concede the Commission may regulate the matter, so long as it does so in conformity to the letter and spirit of the statute; but not that the act remains without vitality until the Commission breathes into it the breath of life. In my view, the railroad company in the present case, having failed to give such a receipt or bill of lading as the statute contemplates, cannot be heard to set up any limitation of its liability for the value of the goods, for it would thereby in effect claim a benefit from its own violation of the law.

I submit that the Hepburn Act, like the original act and its other amendments, is intended to impose duties upon the carrier—the public servant—not upon the shipper or passenger. There is nothing in the letter or the policy of the acts to absolve the carrier from its long-recognized duty to treat all shippers and passengers fairly, and to give them an actual opportunity to make a choice, where a choice is legally open to them. A carrier may not absolve himself in whole or in part from his responsibilities by any *ex parte* action. And where the rate schedules and accompanying regulations are designed to give an option

to the shipper, it is, I submit, incumbent upon the carrier to see that the option is in good faith tendered, or else abide by the more onerous of the alternatives. The Carmack amendment means this, at least, if it means nothing more. Therefore, the failure to deliver a bill of lading evidencing the limitation of liability should impose upon the carrier the highest responsibility, not the least, that the regulations admit of; that is to say, an unlimited responsibility for the goods.

(11.) The serious consequences of the present decision are sufficiently manifest. Heretofore, shippers and passengers have been entitled to rest in the assurance that a common carrier who accepted their goods for transportation in the ordinary course of a carrier's public employment, became responsible, without any express contract upon the subject, for the full value of the goods, in case of their destruction through any negligence of the carrier or its agents, unless there was a distinct understanding to the contrary, participated in by the shipper or passenger. Hereafter, so far as interstate shipments by rail are concerned, the traveler or shipper cannot rest upon any such assurance, and will not be safe in dealing with a railroad company without being authoritatively instructed respecting the latest regulations filed by the carrier with the Interstate Commerce Commission at Washington. He cannot rely upon finding the regulations posted in the railroad station, for this is not essential to the efficacy of the schedules (*Texas & Pac. Ry.* v. *Cisco Oil Mill*, 204 U. S. 449). He cannot rely upon public notices that may be in fact posted in the station, for these may be misleading, as they were in the present case. He cannot rely upon receiving information from the company's local agents, for this may be withheld, as it was in this case. Unless he is possessed of a copy of the tariff schedules as filed, with time enough to scrutinize them, and skill enough to comprehend them, he must perforce accept

whatever terms the railroad company may see fit to offer, and may not hope to be furnished with even a scrap of paper to indicate what those terms are.

I can find no support for the result thus reached, either in the statute or in any previous decision.