WILLIAM K. DICKERSON, Respondent, *v.* ERIE RAILROAD COMPANY, Appellant.

Second Department, February 8, 1918.

Carrier — transportation of live stock — Interstate Commerce Act — oral contract for transportation in violation of Federal statute — estoppel — shipper cannot take advantage of reduced rate and repudiate uniform contract authorizing same — erroneous charge — new trial.

Where schedules filed by a common carrier under the Interstate Commerce Act show its charges for transporting live stock and provide for a uniform bill of lading, fixing a reduced rate at which it will carry live stock, while a rate ten per cent higher is charged if a consignor refuses to execute a " uniform live stock contract," both the shipper and carrier are bound to know that an oral contract for transportation fixing no rate or valuation of the stock is a violation of the Federal act. Hence a consignee whose live stock died in transit because they were not unloaded during ninety-eight hours of transit cannot recover more than the amount limited in a uniform bill of lading upon the contention that said bill of lading was executed without authority and that the agent of the consignor made an oral contract of shipment which fixed no rates. This, because in such case the Interstate Commerce Act and the schedules and bills of lading filed and issued in pursuance thereof would become ineffective.

Moreover, the plaintiff cannot have the reduced rate and disclaim the contract authorizing such rate, otherwise he would be obtaining a discretionary rate and gaining for a lesser charge the benefits of the higher charge.

It was error for the court to charge that the jury might find the oral contract alleged by the plaintiff, for if such oral agreements could be sustained the door is open to all manner of special contracts departing from the schedules and rates filed with the Interstate Commerce Commission.

Although the jury might have found that an agent of the carrier denied the person accompanying the live stock an opportunity to unload them during transit, the error in the charge aforesaid allowing the jury to find the oral contract alleged by the plaintiff requires a new trial.

APPEAL by the defendant, Erie Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Orange on the 28th day of October, 1916, upon the verdict of a jury, and also from an order entered in said clerk's office on the 8th day of November, 1916, denying defendant's motion for a new trial made upon the minutes.

*Elbert N. Oakes* [*Thomas Watts* and *John Bright* with him on the brief], for the appellant.

*J. F. Halstead*, for the respondent.

THOMAS, J.

The plaintiff caused horses to be shipped from Indianapolis to Goshen, N. Y., where upon arrival February twenty-third, two horses were found dead, and others injured, for which he has recovered a verdict. There was a uniform live-stock contract and also a way bill. The plaintiff, after purchasing, assembled the stock at the stables of the Cooley-Frey Horse Company, who appear as the consignors to plaintiff as consignee. The uniform live-stock contract was signed by such company, by Luther Bear, its cashier. The plaintiff paid the freight mentioned in the way bill and appropriate under the contract, and recited in his written notice of damage, dated February 25, 1913, that the Cooley-Frey Horse Company was the consignor. After the arrival at Goshen plaintiff knew that the Cooley-Frey Company was the consignor in the way bill. Indeed, Helfner, who accompanied the shipment, delivered the contract to Lunney, plaintiff's partner, at Goshen. But in this action the plaintiff insists that he and his partner Lunney in person made an oral contract for the shipment with Reynolds, the agent of the initial carrier, without any participation by the apparent consignor or its representatives, and that neither of them ever saw Frey, who, representing the Cooley-Frey Company, was concerned in the directions in the way bill, and that such company or its agent was unauthorized to execute the contract. Three persons in the defendant's employ testified that Frey was present with plaintiff and actually arranged for the shipment. It was planned that Epstein should accompany the car, and he signed the release indorsed on the contract, but remitted the position to his cousin Helfner, who rode in the caboose, but, as he testified, visited and provided for the horses three times each day. The animals had sufficient feed and water, but were not unloaded during the ninety-eight hours of transportation, to which plaintiff ascribes the injury. Helfner states that he was in the act of unloading the horses for the statu-

tory five hours' rest at Salamanca, but that the defendant's agent there prevented it. The agent testified that Helfner said that he did not wish to unload, but wanted feed and water, which were furnished. If the testimony of Geraghty, Reynolds and Tevebaugh, the agents and clerks of the contracting carrier at Indianapolis, supported by the payment of the stipulated freight rate and the notice of claim be accepted, the Cooley-Frey Company not only had authority to make the contract, but did in fact, through Frey, arrange its terms in the presence of plaintiff, and was responsible for the direction in the way bill, " Do not unload unless absolutely necessary," which is in furtherance of the oral directions of Frey, and would, under the charge of the court, prevent recovery unless the immediate custodian of the stock asked to unload at Salamanca and was denied by the agent at that place. But the testimony of plaintiff and Lunney is to the effect that they in behalf of the shipper were the only persons present, and that there was no written contract, and that Reynolds advised them that the horses would be twice unloaded *en route*. To this must be added the testimony of Helfner that he was prevented from unloading. If it were the usual question of fact, it could not be said that the verdict is against the evidence. But the whole matter must be viewed in the light of the Federal law. The spirit of such law, so far as here applicable, is that there must be common opportunity for all shippers. The carrier proffers terms by filing with the Interstate Commerce Commission schedules of charges for transportation, and " all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee." (*Boston & Maine Railroad* v. *Hooker*, 233 U. S. 97, 114.) Such is section 6 of the Interstate Commerce Act, as amended by section 2 of the Hepburn Act (24 U. S. Stat. at Large, 379, 380, chap. 104, § 6, as amd. by 34 id. 584, 586, chap. 3591, § 2; 34 id. 838, Res. No. 47). Such schedules were duly filed by the present initial and connecting carriers. They show charges, and a uniform bill of lading. If the plaintiff shipped, or must be deemed to have shipped, under

the uniform bill of lading, its liability is one thing; otherwise it is something else. The schedules provide a uniform live-stock contract. If one ships under that, the rate is lower than if he does not. The scheduled rate covering the present service was 56 cents per 100 pounds. That is the rate the carrier charged in this instance. It is the rate the shipper paid. It is the rate shown in the way bill. It is a rate that required a uniform live-stock contract. It is a rate that limited the shippers as to value. Such a contract was made with the consignor — the person the plaintiff acknowledged as consignor. Now the plaintiff denies that such person was consignor and that it had the right to make the contract, and relies on an oral contract fixing no rate. But the plaintiff cannot have the rate and disclaim the contract, and unless he expressly agreed to pay a higher rate, the lower rate prevails and in such case the uniform live-stock contract obtains, whether it was or was not actually executed. Otherwise, plaintiff is obtaining a discriminatory rate, and gaining for the lesser charge the benefits of the higher charge. The schedule filed with the Interstate Commerce Commission provides (Rule B): " Unless otherwise provided in this classification, property will be carried at the reduced rate specified if shipped subject to all the terms and conditions of the Uniform Bill of Lading (see pages 23 and 25). If consignor elects not to accept all the terms and conditions of the Uniform Bill of Lading, he should so notify the agent of the forwarding carrier at the time his property is offered for shipment. If he does not give such notice, it will be understood that he desires his property carried subject to the terms and conditions of the Uniform Bill of Lading in order to secure the reduced rate." The plaintiff was bound to know the traffic rules, and if he made no election he fell under the limitations of the uniform contract. The traffic rules provided: " Agents will be expected to thoroughly familiarize themselves with the following, and will take particular care to acquaint consignors, or their agents, with the requirements of the Company before accepting Live Stock for Shipment." Then follows this: " † Live Stock will be taken at the reduced rates fixed in the tariff only when a Uniform Live Stock Contract is executed by the station agent and the consignor, and when the release

on the back of said contract is executed by man or men who are to accompany said live stock. If consignor refuses to execute a Uniform Live Stock Contract, the live stock will be charged ten (10) per cent higher than the reduced rates specified herein, provided that in no case shall such increase be less than one (1) cent per hundred pounds." The " † " " Denotes Changes other than reductions or increases " in the rate. Rule 1 (C and D) are as follows: " (C) Property carried not subject to all the terms and conditions of the Uniform Bill of Lading will be at the carrier's liability, limited only as provided by common law and by the laws of the United States and of the several States in so far as they apply, but subject to the terms and conditions of the Uniform Bill of Lading in so far as they are not inconsistent with such common carrier's liability, and the rate charged therefor will be ten per cent (10%) higher (subject ' to a minimum increase of one (1) cent per one hundred pounds ') than the rate charged for property shipped subject to all the terms and conditions of the Uniform Bill of Lading (see Note).

" (D) When the consignor gives notice to the agent of the forwarding carrier that he elects not to accept all the terms and conditions of the Uniform Bill of Lading, but desires a carrier's liability service at the higher rate charged for that service, the carrier must print, write or stamp upon the Bill of Lading a clause reading: ' In consideration of the higher rate charged, the property herein described will be carried at the carrier's liability, limited only as provided by law, but subject to the terms and conditions of the Uniform Bill of Lading in so far as they are not inconsistent with such common carriers' liability.' " The plaintiff in effect discards the Hepburn Act and the Carmack Amendment (24 U. S. Stat. at Large, 379, 386, chap. 104, § 20, as amd. by 34 id. 584, 593, 595, chap. 3591, § 7; 34 id. 838, Res. No. 47)* which requires a bill of lading to be issued. (*Adams Express Co. v. Croninger*, 226 U. S. 491.) The instance of decision under the act of an unauthorized contract, leaving the shipment with no contract, save an oral agreement to ship

---

*Since amd. by 38 U. S. Stat. at Large, 1196, 1197, chap. 176, and 39 id. 441, 442, chap. 301.— [REP.

with no rate and no valuation given, is not brought to attention. The carrier did not so understand the undertaking, but the jury has found it. But the shipper as well as the carrier must be deemed to know that such an oral arrangement was a violation of the Carmack Amendment, which requires a bill of lading, a departure from the posted and filed schedules, and that the rate given and accepted was such that the carrier's obligation was only that contained in the uniform live-stock contract. If a shipper may deny that by himself or through another authorized he was privy to a shipping contract, or bill of lading, and that there was but a mere agreement to ship with no rates fixed, and a jury may sustain his contention, the Hepburn Act and Carmack Amendment and schedules and bills of lading filed or issued pursuant to them become ineffective. And yet it has been the Federal policy to create a system that would comprehend transportation in its infinite varieties, and reduce to systematic regulation the relation of carriers and shippers through the entire country. Thereby the initial and connecting carriers become as one to the shipper — a consummation of the utmost concern and convenience to the public. In *Georgia, Florida & Ala. Ry.* v. *Blish Co.* (241 U. S. 190, 195), quoting from *Kansas Southern Ry.* v. *Carl* (227 id. 648), Justice HUGHES wrote: " The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the Act [Interstate Commerce Act, § 20, as amd. by Hepburn Act and Carmack Amendment] as measured by the original contract of shipment so far as it is valid under the act." The opinion further declares (p. 197): " The parties could not waive the terms of the contract under which the shipment was made pursuant to the Federal Act; nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that conduct and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the Act and open the door to the very abuses at which the Act was aimed." How much less may the shipper contend that by agreement with the shipper, or by mutual consent or connivance, the Federal act was not observed and the shipment arranged as if it did not

exist, and no schedules filed pursuant to it.  The shipper may not disclaim knowledge or notice of the statute or schedules filed under it.  His knowledge is based on the terms of the bill of lading and the published and filed schedules, and the " 'lawful rate is that which the carrier must exact and that which the shipper must pay.' "  (*Boston & Maine Railroad* v. *Hooker*, 233 U. S. 97, 111.)  To the same effect is *Kansas Southern Ry.* v. *Carl* (227 U. S. 639, 653).  That was said relative to the value declared by the shipper.  But where there is a rate made, and carriage under it, and payment of it made, and it is such as under the schedules demands a certain valuation, and a contract with terms appropriate to that rate, the shipper may not by a plea of ignorance of law, schedules, contract and bill of lading recover a value that is assured by a different rate.  In *Cincinnati & Tex. Pac. Ry.* v. *Rankin* (241 U. S. 319, 328) the opinion states: " But where a bill of lading, signed by both parties, recites that lawful alternate rates based on specified values were offered, such recitals constitute admissions by the shipper and sufficient *prima facie* evidence of choice.  If in such a case the shipper wishes to contradict his own admissions, the burden of proof is upon him."  In the present case the bill does not contain the alternate rates, but it states the rate charged and paid, and the posted and filed schedules show that it entitles the shipper to a recovery for loss limited to that rate, and that it requires the terms and obligations of a uniform bill of lading, or uniform live-stock contract.  In *Atchison, etc., R. Co.* v. *Robinson* (233 U. S. 173), after horses were shipped and the car started, the carrier's agent presented the shipper a printed contract made in conformity to the schedules filed with the Interstate Commerce Commission, but without calling his attention to its contents, or informing him thereof, and without proving assent thereto, although he executed it.  The opinion states: " We regard these cases as settling the proposition that the shipper as well as the carrier is bound to take notice of the filed tariff rates and that so long as they remain operative they are conclusive as to the rights of the parties, in the absence of facts or circumstances showing an attempt at rebating or false billing.  [*Great Northern Ry.* v. *O'Connor*, 232 U. S. 508.]  To give to the oral agreement upon

which the suit was brought, the prevailing effect allowed in this case by the charge in the trial court, affirmed by the judgment of the Supreme Court of the State, would be to allow a special contract to have binding force and effect though made in violation of the filed schedules which were to be equally observed by the shipper and carrier. If oral agreements of this character can be sustained then the door is open to all manner of special contracts, departing from the schedules and rates filed with the Commission. [*Kansas Southern Ry.* v. *Carl, supra,* p. 652.] To maintain the the supremacy of such oral agreements would defeat the primary purposes of the Interstate Commerce Act, so often affirmed in the decisions of this court, which are to require equal treatment of all shippers and the charging of but one rate to all, and that the one filed as required by the act. The Supreme Court of the State in this case affirmed the instruction of the trial court upon which the case was given to the jury, and held that the oral contract was binding unless it was affirmatively shown that the written agreement, based upon the filed schedules, was brought to the knowledge of the shipper and its terms assented to by him. This ruling ignored the terms of shipment set forth in the schedules and permitted recovery upon the contract made in violation thereof in a case where there was no proof that there was an attempt to violate the published rates by a fraudulent agreement showing rebating or false billing of the property, and no circumstances which would take the case out of the rulings heretofore made by this court as to the binding effect of such filed schedules and the duty of the shipper to take notice of the terms of such rates and the obligation to be bound thereby in the absence of the exceptional circumstances to which we have referred." Any privilege not provided for in the schedules is unlawful discrimination, as an agreement to expedite a shipment of horses by a particular train at regular rates (*Chicago & Alton R. R. Co.* v. *Kirby,* 225 U. S. 155), where it was said: " That the defendant in error did not see and did not know that the published rates and schedules made no provision for the service he contracted for, is no defense. For the purposes of the present question he is presumed to have known. The rates were published and

accessible, and, however difficult to understand, he must be taken to have contracted for an advantage not open to others. [*Texas & P. Railway Co.* v. *Mugg*, 202 U. S. 242.]" The court charged that the plaintiff could not recover if the plaintiff made the contract. I think that the court should have charged that the plaintiff was bound by such terms as enter into the contract, whether or not he authorized the Cooley-Frey Company to execute it. But even so, the defendant would be liable if it prevented the plaintiff from performing his stipulation to look after and to unload stock, as the Cruelty to Animals Act (34 U. S. Stat. at Large, 607, chap. 3594) requires. There is no provision in the bill of lading that the stock shall not be unloaded, but that it shall not be unloaded unless absolutely necessary. The agent of the shipper was exercising at Salamanca his discretion to unload, and the defendant's agent had notice of that, and if the jury found that he denied opportunity, he interrupted an attempted observance of the Federal act. And that must be the conclusion whether there was or was not a uniform contract signed, or the notation made on the way bill by plaintiff's consent. But it cannot be known whether the jury found that the defendant was liable because the contract was not made, or because the man was prevented from unloading, or both. But if the plaintiff is amenable to a uniform stock agreement, the valuations provided in the schedules filed must be observed. Hence, for the two horses that died the recovery must be limited to $100 each, and for the injury to the other horses the recovery must be as the ratio of the stipulated to the real value. There should be a new trial.

JENKS, P. J., RICH, PUTNAM and BLACKMAR, JJ., concurred.

Judgment and order reversed and new trial granted, costs to abide the event.