F. W. TULLER, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

CARRIERS: Interstate Carriers—Shipper Conclusively Bound by
1   Approved Limitations.   A shipper who obtains and pays an interstate freight rate which is fixed by a schedule duly filed with and approved by the Interstate Commerce Commission, is *conclusively* held to have contracted with reference to the conditions and regulations provided for in such schedule. So held where the schedule provided for limited and conditional liability.

CARRIERS: Interstate Carriers—Common Law and Limited Liability
2   Rate—Burden of Proof.   A shipper must take notice of the conditions and limitations contained in interstate freight schedules which have been duly filed with and approved by the Interstate Commerce Commission; and when such schedules reveal one rate under which the carrier is held to a common-law liabil-

ity, and another rate under which the carrier is held to a limited and conditional liability, the burden of proof rests on the shipper to show, if such be the fact, that he paid that rate which carried a common-law liability.

**CARRIERS: Interstate Carriers—May Court Declare Approved Condition Unreasonable?** Whether a court may declare that a limitation of liability or other condition contained in an approved interstate freight schedule is unreasonable, and therefore void, *quaere.*

**CARRIERS: Interstate Carriers—Limited Liability Clause—Limitation on Action.** A requirement in an approved interstate freight schedule that suits for damages to a shipment must be brought within 6 months after the claim accrues, is binding upon the shipper.

*Appeal from Allamakee District Court.*—W. J. SPRINGER, Judge.

JUNE 27, 1918.

REHEARING DENIED JULY 7, 1919.

ACTION at law to recover damages alleged to have been sustained by the plaintiff by reason of the defendant's negligence in transporting and delivering a shipment of horses from Postville, Iowa, to the Union Stockyards at Chicago, Illinois. Verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*F. W. Sargent, H. E. Taylor, Robert J. Bannister,* and *J. H. Johnson,* for appellant.

*Burling & Burling* and *William S. Hart,* for appellee.

WEAVER, J.—On February 11, 1912, the plaintiff, a live stock dealer and shipper of 25 years' experience, delivered to the defendant a carload of horses, to be transported to

1. CARRIERS:
interstate car-
riers: shipper
conclusively
bound by ap-
proved limita-
tions.

the Union Stockyards at Chicago, Illinois, under a contract which he alleges was embodied in a bill of lading, which contained no conditions expressly limiting the common-law liability of the carrier. This action is brought by him to recover damages on account of defendant's negligent delay in the transportation and delivery of said shipment. The defendant denies the claim, and denies that the bill of lading constitutes the contract between the parties. It alleges that the agreement upon which it undertook to convey such shipment is contained in a certain written agreement, designated as a "Live Stock Contract," which was duly executed by both parties at the time the horses were received for transportation at Postville. By the terms of the contract pleaded in the answer, the right of the plaintiff to recover upon a claim of the kind here presented was conditioned upon his giving written notice thereof at the time of the delivery of the shipment at its destination, or within one day thereafter, and upon bringing action to recover his alleged damages within six months from the date of such delivery. It was also thereby provided that the agreed value of the horses did not exceed $100 each, and that, in consideration of a reduced rate of freight charges, the defendant's liability for failure to properly perform its contract for the carriage and delivery of the horses should, in no event, exceed $100 for each horse lost or damaged, and in case of injury or partial loss, the amount of recovery should "not exceed the same proportion." The answer further alleges that plaintiff did not comply with the provisions of the agreement for a prompt written notice of his claim, and, in fact, gave no such notice for a period of more than three months, nor did he institute this action until after the right to do so had been barred by the prescribed limitation of six months. The issues were tried to a jury, and verdict returned for the plaintiff. De-

fendant's motion to set aside the verdict and for a new trial was denied, and judgment entered accordingly.

I. While several questions have been elaborately argued by appellee's counsel, the situation is materially simplified by the plaintiff's concession, stated in these words:

Appellee concedes unconditionally, without argument or further waste of time:

(a) That appellant had absolute legal right, in consideration of reduced rate, to contract for limited valuation, and arbitrarily require written notice before removal of stock and a limitation period of six months in which to bring suit.

(b) That the printed form or blank, Exhibit 7, was an authorized and *valid* form for such a contract.

(c) That, if Tuller *validly* executed such contract, knowing its contents, and his signature was not procured by misrepresentation or fraud, he is bound thereby.

"Exhibit 7," referred to in the foregoing concession, is the "Live Stock Contract" which the defendant pleads as the agreement under which it accepted the shipment of the plaintiff's horses.

The dispute as to the execution of this instrument is as follows: The plaintiff alleges and testifies that, after his horses had been placed in the car at Postville, he went to the office of the local agent for the purpose of "fixing up the contract." Concerning what occurred there, he testifies as follows:

"Q. And you signed this original? A. I signed that paper. You mean I signed this memorandum? Q. Yes. A. Yes, sir, original bill of lading. Then he passed over this other instrument,—paper,—and I signed that. I asked him what that was, and he said, 'It was your pass;' and I signed it. I signed it, and put them in my pocket. I lost my specs in working on this car, and we made two false doors to slip down in there, and in carrying it up,—the door,—I had it

against me,—I had my specs like this [indicating], and I. smashed my specs. I said, 'I lost my specs,—what is this? I can't read it.' Q. You told him that? A. Yes, right at this time, and he said, 'That is your pass.' Q. That was signed after the other had been signed? A. Yes. Q. Had the other been delivered to you? A. Yes, sir. Q. Did you ever read that piece of paper? A. No, sir, I never have read one,—I had never read it. Q. Have you ever, in any other shipments, been requested to sign such a paper? A. I don't think so. I have signed papers going to Cedar Rapids, but it was the memorandum and original bill of lading was the only papers I ever had before me on horses I shipped to Cedar Rapids and other places down along this line. Q. Where did you go after getting the car fixed? A. I went down to the depot. Mr. Perry went down, and said he would fix up the contract. He went down and he—there is a kind of memorandum, and original contract they have. He gave me what they call a memorandum, an original bill of lading, and I signed it, and he put over this other paper. 'What is that?' I said. He said, 'That is your pass, your transportation to Chicago and back.' "

On the showing thus made, he alleges that he was deceived and misled by the misrepresentations of the defendant's agent into signing said Exhibit 7, in the belief that it was a pass, and nothing more. The bill of lading is in the form of a receipt by the railway company for the shipment, stating the destination thereof and name of the consignee. In the blank space left for the description of the property were written the words:

"17 or 18 Head Horses. S. L. & C. O. R. Contract value. Contract."

Printed upon the back of this bill are certain conditions, mostly of a general nature, but prescribing no limitation upon the value of the property for which the carrier may be held liable, "unless a lower value has been repre-

sented in writing by the shipper, or has been agreed upon or has been determined by the classification or tariffs upon which the rate is based, in any of which events such lower value shall be the amount to govern such computation." It also provided a four months' limitation for the presentation of claims for loss, damage, or delay. This paper was signed by the plaintiff for himself, and by the agent for the company.

The live stock contract which was executed at the same time, and which plaintiff claims was represented and delivered to him as a pass, is in the form of a contract between the defendant company, as party of the first part, and the plaintiff shipper, as party of the second part. On its part, the company undertakes to receive and transport the carload of horses from Postville to the stockyards at Chicago. It also provides that the freight charge was less than the rate for such service when performed at the carrier's risk, and that, in consideration thereof, the parties agreed to certain conditions, among which are those to which we have referred: the service of written notice of claim within one day after the delivery of the property at destination, the bringing of action upon such claim within six months, and the limitation upon the value of the shipment. It also provides for a pass, or for transportation of the shipper or other person having charge of the shipment for him.

In pleading, and upon the trial, plaintiff insisted that he was deceived by the representations made to him by the defendant's agent, into signing and accepting such paper as a pass, and without knowledge that it contained any stipulation or condition affecting his rights as a shipper, or as releasing the defendant from its full common-law liability for the proper and prompt transportation of the horses. The court, at plaintiff's request, submitted to the jury special interrogations whether defendant's agent did misrep-

resent the terms of the contract to the plaintiff, and whether plaintiff was thereby deceived or misled into attaching his signature thereto, both of which inquiries were answered in the affirmative.

Plaintiff stakes his case in this court upon the proposition that this finding by the jury establishes the fact that the bill of lading is the only contract between the parties, and that the conditions found in the live stock contract, requiring prompt written notice of the claim and limiting the time for bringing action thereon, do not bind him.

Assuming, for the present, that the finding of the jury has sufficient support in the evidence, the contention so made by the plaintiff is indisputable, unless the force and effect of such finding are avoided by the defense pleaded and relied upon by the defendant, which is as follows: It is alleged that, at the time these horses were shipped, the railway company had two rates of freight for the transportation of live stock, which rates were based upon the value of the shipment, the lesser rate to be charged when the shipment was made under a contract limiting the liability of the carrier, and making the shipper's right of action for a violation of such contract subject to the conditions which are pleaded in defense to the pending action, and a 50 per cent greater rate where the carrier assumes full common-law liability for the safe and prompt delivery of such shipment. It is further alleged that these schedules or tariffs, together with the form of contract to be used where the shipper takes advantage of the lower rate, were filed with the Interstate Commerce Commission, which had approved the same, and that, being so approved, they constitute the standard by which the mutual rights and obligations of the shipper and carrier are to be measured and determined. Resting upon this legal proposition, the defendant claims that the rate charged by it and paid by the plaintiff was the lower rate, based upon the limited value of the horses and upon

the limited liability of the carrier, as provided in the approved form of contract above mentioned, and that, without regard to the question whether plaintiff did or did not sign said contract; or signed it without knowing its contents, or signed it believing it nothing more nor less than a pass for his transportation, he is still conclusively held to have known that the reduced rate which he obtained and paid had been made in consideration of the limited liability assumed by the carrier, as indicated in the approved form of contract and schedule filed with the Interstate Commerce Commission, and that such conditions could not be lawfully ignored or waived or materially changed by any agreement, either written or oral.

Whatever we may think of the reasonableness or unreasonableness of the rule thus stated, it seems to have the approval of the courts which speak with final authority upon the interpretation and effect of Federal legislation. In *Boston & M. R. Co. v. Hooker*, 233 U. S. 97 (58 L. Ed. 868), a controversy over the interstate transportation of baggage, the Supreme Court of the United States, speaking of the effect of a regulation or condition for limited liability which the carrier has attached to its schedule of rates (such schedule and regulation having been approved by the Interstate Commerce Commission), uses this language:

"The effect of the filing gives the regulation as to baggage the force of a contract determining baggage liability."

Such, also, is the clear force and effect of the decision of the same court in *Atchison, T. & S. F. R. Co. v. Robinson*, 233 U. S. 173 (58 L. Ed. 901), where the shipper denied having assented to the terms of a limited liability contract, and claimed to have made the shipment under an oral agreement; and it was held to be his "duty to take notice of such (schedule) rates and the obligation to be bound thereby." See, also, *Kansas City So. R. Co. v. Carl*, 227 U. S. 639 (57 L. Ed. 683) ; and *Georgia, F. & A. R. Co. v. Blish Mill.*

*Co.*, 241 U. S. 190. Under the law as declared by these and other precedents, the shipper who obtains and pays the rate fixed by an approved schedule is conclusively held to have contracted with reference to the conditions and regulations provided for in such schedule. They are, in legal effect, incorporated into his contract. Indeed, the waybill upon which plaintiff relies as expressing the contract between him and the defendant itself recites that the property was received for transportation "subject to the description and tariffs in effect" on that date. Moreover, we are inclined to the view that the words written into the waybill, "O. R. contract value. Contract," although somewhat obscure, and although the trial court excluded oral testimony explaining them, fairly indicate the existence or execution of a contract other than is expressed in the waybill alone. That the payment of a scheduled rate has the effect to bind both shipper and carrier to the observance of the conditions and limitations of such schedule has also been held by this court in *Herminghausen v. Adams Exp. Co.*, 167 Iowa 230, and *Richter & Sons v. American Exp. Co.*, 180 Iowa 1037.

The only doubt of the applicability of this rule to the instant case arises upon the inquiry whether the evidence clearly shows that the freight rate paid by the plaintiff was the reduced rate to which a limited liability of the carrier was attached. The record in this respect is somewhat confused. The approved tariff schedules appear to have been identified and offered in evidence, showing the charge from Postville to Chicago to be $71.50 per car, plus a terminal charge of $2.00 a car, and to have attached thereto the following restrictive regulations:

2. CARRIERS: interstate carriers: common-law and limited liability rate: burden of proof.

"Rates on live stock published in tariff will apply only on shipments made at owner's risk, with limitation of liability on the part of the railroad company as a common

carrier under the terms and conditions of the current live stock contract provided by said company, said contract to be first duly executed in the manner and form provided for therein."

It is argued, in substance, that there is no competent evidence that the plaintiff paid the specified rate of $73.50 per carload, and therefore it does not appear that he consented to the limitation of the defendant's liability. The trial court excluded, upon plaintiff's objection, most of the testimony offered bearing upon that fact; but, if we correctly interpret the court's statement in so ruling, it was based on the theory that the legal and authorized rate was already in evidence, and the parties were conclusively held to have contracted with reference thereto. The defendant's station agent, who dealt with plaintiff in making the shipment, having been asked as a witness concerning the rate of freight charged, and plaintiff having objected thereto, the following colloquy between court and counsel ensued:

"By the Court:   I understand you made a contract, and that the law fixes the rate of that contract.

"By Mr. Hart:   Yes, sir.

"By the Court:   *And that you couldn't charge but just one charge. You have the rate here in court introduced in evidence as to what it should be, and* I do'nt think I will permit you to show you violated the law or that you conformed to it, either one.   (Objection sustained.   Defendant excepts.)"

Now, the rate which the schedule in evidence disclosed was $73.50 per carload, and attached to this rate and schedule was the provision for limited liability of the carrier; and it is only on the theory that this was, in fact, the rate paid, or that, the schedule rate being shown, plaintiff could not be heard to deny such rate, that the ruling above mentioned and numerous other rulings of similar character can be sustained.   Moreover, the burden being upon the plain-

tiff to establish the cause of action pleaded by him, and the transaction being one of interstate commerce, governed and controlled by the Federal statutes and by rates and regula- tions established and approved by the Interstate Commerce Commission, and the extent of the liability of the carrier being made dependent upon the rate paid, we are of the opinion that it was incumbent upon him to prove the same. In other words, in the absence of such showing, there is no presumption that the carrier assumed an unlimited risk. as at common law.  It will not do to say that, if the plain- tiff was deceived into signing the live stock contract, and if the waybill alone is the only paper legally executed by the parties, it should be held to imply a common-law lia- bility;  for such waybill is in no manner inconsistent with the theory that the rate paid was the one provided in the limited liability schedule.   True, it does not specifically name the rate, but it does provide, as we have already noted, that the shipment is made subject to the classifications and tariffs in effect on that date;  and assuming, as the record shows, that the tariff or schedule or rates varied according to the degree or extent of the liability assumed by the car- rier, proof of the rate actually paid or actually agreed upon is quite essential in determining the rights of the parties.  It must be presumed that some rate was agreed upon, and that such rate was one provided for in some of the approved schedules.  The rate being ascertained, the schedule is there- by identified.  If the bill of lading expressly disclosed the rate, this might well be held to impose upon the carrier the burden of proof that another and different rate was, in fact, paid (should such defense be made) ;  but, on a sufficient showing that the rate paid was in accordance with a sched- ule imposing a lesser degree of liability, such defense would prevail, notwithstanding the terms of the bill.

Taking the record pertaining to these facts as a whole,

we hold that the evidence is insufficient to sustain the verdict, and that it should be set aside.

The writer of this opinion is free to admit that the rule established by the governing precedents and here applied seems to allow common carriers and their agents to bid for business by holding out false inducements to shippers, many, if not most, of whom do not understand the rigid regulations imposed by the Federal statutes, and to clothe the wrongdoers with immunity against liability to those who are thus misled and deceived. This remark is made with no special application to the present controversy; for we think it quite doubtful whether, were the rule otherwise, plaintiff made a case for the jury on the issue of fraud and misrepresentation.

II.    It is also said in argument that, even if the shipment was made under the terms of the limited liability rates of freight, the provision which requires notice of plaintiff's claim immediately on the delivery of the

3. CARRIERS: interstate carriers: may court declare approved condition unreasonable?

horses at their destination, or within one day thereafter, is unreasonable, and should not be enforced. Laying aside the question whether it is competent for the trial court or the jury or this court to declare unreasonable and void a regulation of interstate commerce which has the approval of the Interstate Commerce Commission. it is to be said that, even if this position is to be sustained. a like criticism is not applicable to the fur-

4. CARRIERS: interstate carriers: limited liability clause: limitation on action.

ther provision limiting the right of action for such damages to a period of 6 months. Plaintiff waited 18 months before bringing suit; and if this contract limitation is applicable, as we hold it to be, it constitutes a bar to a recovery in this action.

Many exceptions have been preserved to the admission and exclusion of testimony; and, were the case not con-

trolled by the other questions already considered, we should be compelled to hold that several of these rulings constitute reversible error; but, as a reversal must be ordered on other grounds, we need not further consider them.

For the reasons stated, the judgment below is reversed and cause remanded for further proceedings not inconsistent with the views expressed in this opinion.—*Reversed.*

Preston, C. J., Gaynor and Stevens, JJ., concur.